## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**STEVEN F. D'AMICO,**

     **Plaintiff,**

**vs.**                                     **Case No. 4:15cv127-MW/CAS**

**DR. VERNON MONTOYA,**
**DR. A. BUCARELLI,**
**DR. ALFONSO MARTINEZ,**
**DR. P. MARCEUS,**
**DR. HEZEKIAH OWOJUYIGBE,**
**and JULIE JONES,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Defendant Dr. Hezekiah Owojuyigbe filed a document which was both objections to a prior Report and Recommendation, ECF No. 111, and a motion for summary judgment. ECF No. 117. Dr. Owojuyigbe's objections were referred to United States District Judge Mark Walker, *see* ECF No. 119, and subsequently overruled, ECF No. 125, and ruling was deferred on the summary judgment motion. Plaintiff was given a deadline to respond to the motion after conclusion of the discovery period, and advised of his obligation to respond under Rule 56 and Local Rule 56.1. *Id.*

Plaintiff's response was timely filed, ECF No. 144, and the motion filed by

Dr. Owojuyigbe is ready for a ruling.

Procedurally, Dr. Owojuyigbe ["Dr. Owo"] was substituted as a

Defendant pursuant to Rule 25(d) for Dr. Marceus, the chief health officer

at Columbia Correctional Institution.  *See* ECF Nos. 59, 98.  Plaintiff's

Eighth Amendment claim proceeds against Dr. Owo in his official capacity

for injunctive relief only.  *See* ECF Nos. 98 and 106.  Dr. Owo filed a notice

withdrawing the affirmative defense of failure to exhaust administrative

remedies.  ECF No. 135.  Regardless, the defense had already been

rejected, *see* ECF Nos. 98, 106, 129, and 137.

In general, Dr. Owo contends that Plaintiff "has received adequate

medical treatment" and this case is a dispute "with the medical treatment

he has received and continues to receive."  ECF No. 117 at 2.  Dr. Owo

argues that "Plaintiff was referred to, and offered, adequate medical care,

however refused the care because he disagreed with it."  *Id.*

## I.  Allegations of the Complaint

Plaintiff Steven D'Amico's second amended complaint [hereinafter

"complaint"] presents claims under the Eighth Amendment.  ECF No. 13.

Mr. D'Amico contends Defendants have been deliberately indifferent to his

medical needs and have denied him "necessary medical care and medications." *Id.* at 10.  Mr. D'Amico alleges that in 2007, he was diagnosed with Chronic Lymphocytic Leukemia (CLL), a "slow growing blood cancer . . . ." *Id.* at 5.  Mr. D'Amico asserts that CLL cannot be cured, "but can be managed with proper treatment for 25 years." *Id.* Mr. D'Amico began a rigorous course of treatment in 2007 which included monoclonal anti-body therapy and the medication Rituxan. *Id.* Mr. D'Amico said that those quarterly treatments managed his cancer for seven years. *Id.*  In 2008, Mr. D'Amico also had "numerous skin lesions" removed and was prescribed sunblock, hat, long sleeve shirts, and diphorhydramine because, as a cancer patient, he "is at greater risk for developing secondary cancers." *Id.*

In 2012, the Department of Corrections contracted with Corizon to provide health care to inmates in its custody. *Id.* at 6.  Following that change, Mr. D'Amico was no longer provided "skin protection passes" and was no longer seen by a dermatologist. *Id.*  Mr. D'Amico alleges that Corizon did not make a dermatologist available to "inmates in need of skin care." *Id.* at 8.  In 2014, while housed at Taylor Correctional Institution, Mr. D'Amico again sought skin protection, but the request was denied by

Defendant Bucarelli who Mr. D'Amico said was "dismissive."  ECF No. 13 at 6.  Since being denied skin protection, Mr. D'Amico states he was "exposed to long periods of sun [daily] at Taylor C.I. . . . and developed countless more moles and blemishes which have never been examined by a Dermatologist or any medical staff."  *Id.* at 7.

In October 2014, Mr. D'Amico's Rituxan maintenance treatments were "suddenly discontinued" by Defendant Montoya.[1]  *Id.* at 8. Mr. D'Amico said he was told that pursuant to "policy," he was supposed to receive Rituxan for only two years.  *Id.*  Mr. D'Amico reports that he has not seen an oncologist since that time and has "not received medical care of any kind for CLL since October 8, 2014."  *Id.*  Mr. D'Amico complains that the "lymph nodes in his neck have become enlarged and sore since the Rituxan treatments were stopped."  *Id.*  He alleges that failing to treat CLL allows it "to progress at great risk to Plaintiff."  *Id.*

Mr. D'Amico also contends that Defendant Montoya suspected he had a cancerous skin lesion on his face in October 2014, but "was prevented" from providing treatment, at least in part, because Corizon did not make a dermatologist available.  ECF No. 13 at 8.  Mr. D'Amico says

---

[1] Dr. Vernon Montoya was an Oncologist employed at the Reception and Medical Center in Lake Butler, Florida.  ECF No. 13 at 2.

he lives under emotional duress because the lesion has continued to develop and, also, "because of another lesion on the inside of his mouth which has gone untreated." *Id.* at 9.  Mr. D'Amico reported the lesion to Defendant Montoya at his last cancer clinic appointment on October 8, 2014, at R.M.C., but Mr. D'Amico contends the "lesion has been allowed to grow to the point where it now gets bitten when Plaintiff eats food." *Id.*

Mr. D'Amico alleged that as of July 2015 when the complaint was filed, he was confined at Columbia C.I. Annex.  ECF No. 13 at 9.  Despite having "submitted sick call requests and [having] filed grievances regarding the discontinuance of Rituxan treatments for CLL, and other cancer concerns" he still "has not received any meaningful medical care at Columbia." *Id.*  Mr. D'Amico says he is still denied "passes for sunblock, hat, long sleeve shirts, and skin examinations . . . ." *Id.*

## II. Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[2] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury).  The Court must decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."), but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

## III.  The relevant Rule 56(e) evidence

Mr. D'Amico is currently 57 years of age and entered the custody of the Department of Corrections in 2006.  Ex. A at 5, 9.[3]  In 2007,

---

[3] Mr. D'Amico submitted only one exhibit with his response, ECF No. 114 at 12. That exhibit will be referenced as Plaintiff's Exhibit 1, and all other references to exhibits are to those submitted with Dr. Owo's summary judgment motion, ECF No. 117, which are identified by alphabetical name.  Additionally, the page numbers referenced are to the actual page number of the exhibit and not the page number on CMECF as Mr. D'Amico does not have access to the Court's electronic docket.

Dr. Montoya, an Oncologist, diagnosed Mr. D'Amico with CLL (Chronic Lymphatic Leukemia).  *Id.* at 17.  Mr. D'Amico also had a biopsy performed in 2007 of a lymph node from his neck and was diagnosed with lymphoma. Ex. A at 36-37.  Mr. D'Amico was placed on an "intensive regimen, which included Rituxan and several other chemos" which lasted for approximately six months.  *Id.* at 17-18.  Afterwards, he was "put on a reduced maintenance schedule of Rituxan every three months" and seen by Dr. Montoya every three months.  *Id.* at 18, 26.

That treatment lasted for approximately seven years, until October 8, 2014.  *Id.* at 18, 20-21.  On Mr. D'Amico's final visit with Dr. Montoya "he discontinued the Rituxan and all contact with him."  *Id.* at 21.  Dr. Montoya told Mr. D'Amico that he "was only supposed to be on Rituxan for two years" but had been on it for seven years.  *Id.* at 22.  Dr. Montoya's records noted that the newest medical evidence indicates a patient should take Rituxan for a maximum of two years.  Ex. A at 22.  The evidence reveals that Dr. Sweetser also told Mr. D'Amico that he should not have been on the medication for seven years.  *Id.* at 102-103.

Mr. D'Amico disputes that Dr. Montoya told him the decision to discontinue Rituxan was based on medical evidence and, instead, testified

that the discontinuation was due to "policy."  *Id.* at 23-24.  Mr. D'Amico

thought that Dr. Montoya indicated it was pursuant to Corizan's policy.  *Id.*

at 25.  Mr. D'Amico also said that staff "would make remarks about how

expensive it was."  *Id.* at 63.  He testified that there were "other incidents

where they were concerned about the availability, that the therapies were

becoming scare, the costs were going up, how expensive they are, and

how there's a shortage."  *Id.*  He was that "was the term that was used on

one occasion, there was a shortage of Rituxan."  *Id.*

Dr. Bucarelli submitted an affidavit with Dr. Owo's summary judgment

motion explaining that on October 8, 2014, Mr. D'Amico was seen by

"oncologist Dr. Vernon Montoya to follow up for his CLL/low grade

lymphoma."  Ex. B at 3.  Mr. D'Amico "had been receiving Rituxan about

every three months since 2007, but Dr. Montoya planned to discontinue it

because the newest medical evidence showed that a patient needs to be

on it for a maximum of two years."  *Id.*

Dr. Bucarelli also explained that Dr. Montoya noted Mr. D'Amico "had

a skin lesion on his nose consistent with basal cell carcinoma (BCC)."  Ex.

B at 3.  Dr. Montoya planned a one month follow up after Plaintiff

"completed lab work and had a CT scan of the chest, abdomen, and

pelvis." *Id.*  Dr. Montoya's "assessment and plan" as reflected in the

Consultant's Report for October 8, 2014, was to refer Mr. D'Amico "to

surgery for excision" of the skin lesion on his nose.  *Id.;* MR at 1.  However,

Mr. D'Amico was transferred from Taylor Correctional Institution to Cross

City Correctional Institution on October 24, 2014.  Ex. B at 4.

Mr. D'Amico said that Dr. Montoya observed the lesion on his nose,

which Mr. D'Amico had thought "was a mole or something."  Ex. A at 35.

Dr. Montoya attempted to writ a consult for a dermatologist, but the "nurse

said there isn't a dermatologist."  *Id.* at 35-36.  Dr. Montoya then referred

him to a surgeon.  *Id.* at 36.

On November 6, 2014, Mr. D'Amico was seen by Dr. Llorens who

"noted Dr. Montoya's plan to discontinue Rituxan and order labs and a CT

scan."  Ex. B at 4.  Dr. Llorens submitted a consultation request for the CT

scan, which "was approved and an appointment was made for November

14, 2014."  *Id.*; *see also* MR at 6.[4]  Mr. D'Amico, however, "refused to go" to

the CT scan.  Ex. B at 5 (citing MR at 7).  The medical records indicate that

Mr. D'Amico signed a refusal form after being educated on the importance

---

[4] Attached to Dr. Bucarelli's affidavit, Exhibit B, were copies of Mr. D'Amico's
medical records.  That attachment, which was submitted as Defendant's Exhibit A, is
referenced as MR and the page number of the medical record.  *See* ECF No. 117-2 at
14-78.  To be clear, MR is the attachment to Exhibit B.

of the test.  MR at 10; *see* also Ex. B at 5.  Mr. D'Amico explained in his

deposition that he refused to have the scan because he "already had

cancer" and did not "need any extra radiation."  Ex. A at 54.  Instead, he

asked for an MRI on several occasions.  *Id.*  He said that in the beginning,

he "was getting CAT scans the whole time, and the frequency concerned"

him.  *Id.* at 55.

Dr. Owo submitted evidence that Mr. D'Amico also refused another

medical appointment on November 18, 2014.  Ex. B at 5 (citing to MR at

10).  The medical records include a notation that security called medical,

informing them that Mr. D'Amico "did not want to go on medical run in AM."

MR at 10.

Mr. D'Amico testified that this is a "complete fabrication" and said he

did not refuse to go to medical for any appointments.  Ex. A at 125-126.

He said that he had been on pain medication and on the last day, a nurse

told him: "[I]if you come here at 12:01, you're not getting anything."  *Id. at*

*125.*  The nurse said: "You need to get here before 12:00 midnight because

your prescription ends 12:00 midnight."  *Id.*  "You come one minute past,

you're not getting anything."  *Id.*  Mr. D'Amico said that he relayed that

information to the dorm officer, but the officer waited and did not come to

get him until "1:00 in the morning."  *Id.*  Mr. D'Amico said he told the officer:

"I don't need to go to medical now, because the nurse told me not to come

if it's past 12:00."  *Id.* at 125-126.

However, Mr. D'Amico did acknowledge that he refused to meet with

Dr. Hagan, the surgeon referred by Dr. Montoya.  Ex. A at 36-38.

Mr. D'Amico said he refused to see him because he was "the same

surgeon that left surgical clips in [his] neck when he did the lymph node

biopsy . . . back in 2007 . . . ."  *Id.* at 36; *see also* p. 38.  Mr. D'Amico also

explained that in addition to not wanting to see Dr. Hagan, he thought he

"should see a dermatologist who would do a biopsy" which was "more in

line" with Dr. Montoya's original plan.  *Id.* at 38.

Mr. D'Amico saw Dr. Llorens on November 20, 2014, for complaints

of neck pain and his refusals for treatment.  Ex. B at 5.  That appointment

was a follow up to Plaintiff's sick call visit on November 12, 2014, during

which he complained of back and neck pain, a "small lump" on the inner

cheek, and swelling on right lower leg.  MR at 8-9; Ex. B at 5.  The nurse

noted that Mr. D'Amico had a "possible growth inside" his right cheek and

referred him to the doctor for follow up.  MR at 9.  The record also includes

the notation: "He knows he has lymphoma & is worried he now has cancerous lesions in his mouth and on lower [right] leg." *Id.*

Mr. D'Amico was transferred from Cross City Correctional Institution to Charlotte Correctional Institution on December 8, 2014.  Ex. B at 5. After having lab work on December 10 and 24, 2014, Mr. D'Amico was seen by Dr. Hemphill on January 9, 2015.  *Id.*  Dr. Hemphill noted in the medical records that Mr. D'Amico "had refused to see a general surgeon for the lesion on his nose and refused the CAT scans because he was worried about the radiation."  Ex. B at 5 (citing MR at 16).  Mr. D'Amico was transferred to Columbia Correctional Institution on January 16, 2015.  Ex. D.

After having more lab work on January 29, 2015, Mr. D'Amico was seen by Dr. Marceus on February 2, 2015.  Ex. B at 6.  Dr. Marceus determined that Mr. D'Amico's "CLL was stable."  *Id.* (citing MR at 20).  He "ordered additional labs and a follow up" in six months.[5]  Mr. D'Amico disputes that his CLL was "stable" based on the January 2015 lab report

_____

[5] It was during this time period that Mr. D'Amico initiated this litigation and filed the original complaint, ECF No. 1, on March 5, 2015.

which revealed several abnormal findings in hematology.  ECF No. 144[6] at

9 (citing to Ex. A at 19); *see* also July 2015 lab report, Ex. A at 26.

Mr. D'Amico went to sick call on April 20, 2015, complaining of

"swollen lymph nodes in his neck and abdominal pain."  Ex. B at 6.  The

medical record notes Mr. D'Amico's chief complaint was a "hard mass on

lower side of abdomen."  Ex. E at 10.  He was scheduled to see the doctor

for further evaluation on April 29, 2015, *see id.* and MR at 22, but the

appointment was rescheduled due to an unexplained "security issue."  MR

at 23; Ex. B at 6; Ex. E at 12.  The notation for the "Doctor's Clinic" for April

29, 2015, was "enlarged & painful lymph nodes - ABD mass - migraines."

Ex. E at 12.

Mr. D'Amico was seen by ARNP Pastora in the Doctor's Clinic on

May 6, 2015, for "complaints of discomfort on the right side of his neck and

abdominal pain."  Ex. B at 6; Ex. E at 14.  Pastora noted his history of CLL

which had been treated with Rituxan for seven years and noted

Mr. D'Amico was requesting a refill.  MR at 24.  Pastora also "noted that Dr.

Montoya had recommended a follow up in November with blood work

results and CT scan results, but [Mr. D'Amico] refused to have the CT scan

---

[6] Mr. D'Amico's response, ECF No. 144, is the equivalent of a declaration as it is sworn under penalty of perjury.  ECF No. 144 at 11.

done."  Ex. B at 6; MR at 24.  Pastora's examination of Mr. D'Amico

revealed "enlarged, tender lymph nodes in his neck."  *Id.*  Mr. D'Amico was

scheduled for an ultrasound of the abdomen and lab work, and she

"planned to submit a consult with Dr. Montoya with the lab work results."

*Id.* (citing MR at 24); *see also* Ex. E at 14.

Following Mr. D'Amico's lab work in July 2015, he was seen by

ARNP Pastora in the chronic care clinic on August 17, 2015.  Ex. B at 7.

Pastora noted in the medical records that his "CLL control was good/fair."

*Id.*  She also noted that an appointment would be scheduled for a biopsy of

the skin lesion.  MR at 28.  Another notation in the record states that a

consult would be written for Dr. Montoya "after blood work done."  *Id.*

The lab work was done on August 20, 2015.  Ex. B at 7.  Mr. D'Amico

had an abdominal ultrasound on September 18, 2015, for his complaints of

abdominal pain.  *Id.*  The results were normal, *id.*, and reviewed by ARNP

Pastora on September 23, 2015.  MR at 32.  The medical record notes that

on October 29, 2015, a formal grievance was answered, but there is no

indication that Mr. D'Amico was seen by medical until he reported to sick

call on November 7, 2015.  MR at 32-33.  Nurse Hartley noted in the chart

that Mr. D'Amico was complaining of "stomach pain and nobody told" him

the results of the ultrasound.  MR at 33.  The nurse said that Mr. D'Amico was not complaining of pain but seemed angry about his medical care.  *Id.* It was also noted that Mr. D'Amico was "talking about 'statute of limitations'" but did "not appear to be in any distress at [that] time."  *Id.* Nurse Hartley determined no treatment was necessary at that time and noted that an order had been entered for a biopsy on his nose.  *Id.*  Finally, the record reveals that Mr. D'Amico was requesting "a hat, sunscreen, Excedrin for headaches and to see the [Doctor]."  *Id.*  Nurse Hartley said Mr. D'Amico's chart would be referred to the doctor.  *Id.*

On November 9, 2015, an Excedrin order was written and Mr. D'Amico was scheduled for an evaluation by the doctor.  *Id.*; *see also* Ex. B at 8.  On the following day, November 10th, Mr. D'Amico again went to sick call asking why he had not had a follow up appointment with the doctor.  MR at 33.  He was informed that he had an appointment scheduled.  *Id.*  The sick call visit ended due to Mr. D'Amico "insulting staff."  Ex. B at 8; *see also* MR at 33.

On November 18, 2015, Mr. D'Amico was seen by Dr. Pinero in the doctor's clinic for his complaints of occasional abdominal pain on the left side.  Ex. B at 8 (citing MR at 34).  Dr. Pinero noted the "abdominal

ultrasound was within normal limits." *Id.*  On November 25, 2015,

Mr. D'Amico was again seen by Dr. Pinero, this time for the lesion on his

nose.  Ex. E at 27.

The biopsy on the right side of Mr. D'Amico's nose was finally

performed on December 18, 2015.  Ex. B at 8 (citing MR at 35).  "The

diagnosis was atypical basaloid neoplasm consistent with BCC."  *Id.* at 8.

Dr. Pinero reviewed the biopsy results and evaluated Mr. D'Amico again on

December 29, 2015.  Ex. E at 30.

On January 15, 2016, ARNP Dawson submitted a consultation

request for a plastic surgeon to evaluate Mr. D'Amico based on the results

of the biopsy.  Ex. B at 9.  The provisional diagnosis stated on the request

was "basal cell cancer" on the right side of the nose.  MR at 41.  The

request appears to indicate the "small lesion" had increased in size since

"last year."  *Id.*  Mr. D'Amico also reported in his deposition that the lesion

had grown by "fifty percent."  Ex. A at 69.  He explained: "It wasn't twice the

size, but it was half of what it was bigger than it was prior."  *Id.*  The request

was approved and an appointment scheduled for February 3, 2016.  Ex. B

at 9.

On January 26, 2016, the senior dentist at Columbia Correctional

Institution Annex submitted another consultation request for a biopsy due

to Mr. D'Amico's "concern about a nodule on the inside of his right cheek

that appeared to be fibroma."  Ex. B at 9; *see also* MR at 42.

Mr. D'Amico saw Dr. Ong, a plastic surgeon, on February 3, 2016.

Ex. B at 9.  Dr. Ong noted "BCC of the right nose groove, a skin lesion on

the lower back, and a mass in the right buccal area (cheek)."  *Id.*  Dr. Ong

submitted an urgent request for approval of excisions.  *Id.*; *see also* MR at

445-46.  The medical record also reveals that an "urgent" request for the

excision of several areas was submitted by ARNP Dawson on February 3,

2016.  MR at 44.  ARNP Dawson also reviewed his chart on February 9,

2016.  Ex. E at 34-36.  A notation in the chart reflects that Mr. D'Amico

would need a "CAT scan of abdomen" for a follow-up appointment with

Dr. Montoya.  *Id.* at 36.

Mr. D'Amico was examined by Dr. Render, a dentist, on February 10,

2016, "for complaints of a slowly enlarging nodule on the right buccal

mucosa."  Ex. B at 9; *see also* MR at 49.  Dr. Render performed "an

excisional biopsy" of the area which revealed "oral fibroma."  Ex. B at 9-10.

> Oral fibroma is a common benign scar-like reaction to
> persistent long-standing irritation in the mouth.  The most

common location of oral fibromas is on the inside of the cheek
where the upper and lower teeth meet.  Oral fibroma is usually
due to chronic irritation such as cheek or lip biting or rubbing
from a rough tooth.  Oral fibromas do not develop into oral
cancer.

Ex. B at 10.

On February 11, 2016, Mr. D'Amico was seen by ARNP Pastora to

evaluate the need for a CT scan and oncology consult.  Ex. B at 10.  At that

time, it was noted that Mr. D'Amico had a history of CLL and BCC, and had

previously refused a CT scan.  Mr. D'Amico still was refusing the scan but

wanted to see an oncologist.  *Id.*  An oncology consult was submitted, *see*

MR at 53, and ARNP Pastora issued him passes for sunscreen, a straw

hat, and a long sleeve shirt.  Ex. B at 10; *see also* MR at 51-52.

On March 2, 2016, Mr. D'Amico was examined by Dr. Matthew

Sweetser, an oncologist.  Ex. B at 11.  He noted Mr. D'Amico's history of

"CLL/low grade lymphoma" since 2007.  MR at 54.  He submitted a request

for a follow-up in four months, and an appointment was scheduled for July

5, 2016.  *Id.* at 54-55; Ex. B at 11.

On March 28, 2016, Mr. D'Amico was seen by Dr. Ong for the

excision procedure.  Ex. B at 11.  Not only did Mr. D'Amico have an

excision of the right nasal groove, but "multiple other hyperpigmented

lesions of the head, right ear, right shoulder, back, chest, and right forearm"
were excised.  *Id.*; *see also* MR at 57.

Mr. D'Amico "also had blood drawn for labs."  Ex. B at 11.  ARNP
Dawson reviewed Mr. D'Amico's lab work on April 4, 2016, and found his
white blood cells were elevated.  Ex. B at 11.  Mr. D'Amico was prescribed
Keflex and was to have follow-up labs in a week.  *Id.*  The follow-up lab
work was done on April 11, 2016.  *Id.* at 12.

On April 6, 2016, Mr. D'Amico was seen in sick call with complaints of
chest pain, dizziness, numbness in his left arm, and a headache.  Ex. B at
11.  Mr. D'Amico said he had been in a lot of stress.  The nurse took his
vitals, which were normal, and performed an EKG.  *Id.*  The nurse also
"requested the ARNP to evaluate [Mr. D'Amico] that day, but the
appointment was rescheduled due to security locking down [the] facility."
*Id.*

Mr. D'Amico saw ARNP Dawson on April 13, 2016, for chest pain.
Ex. B at 12.  Dawson noted that EKG results were "atypical due to anxiety."
*Id.*  She also removed the sutures from the excision sites.  *Id.*

On May 1, 2016, Mr. D'Amico was seen in sick call for complaints of
another lesion on the right side of his nose.  Ex. B at 12.  "The nurse

documented lichenification - thickening of skin accompanied by accentuation of skin markings."  *Id.*; *see also* MR at 65.

"Beginning in April 2016, Centurion began incrementally replacing Corizon as the contracted health care provider for many prisons and jails in Florida."  Ex. B at 13.  "On May 8, 2016, Centurion took over healthcare operations . . . from Corizon."  *Id.*  "Corizon no longer has any role in the care" or treatment of Mr. D'Amico.  *Id.*

Mr. D'Amico testified in his deposition that when Corizon took over providing medical care to inmates within the Department of Corrections, transferring inmates to an outside hospital or medical facility to see a specialists was done "far less frequently."  Ex. A at 97.  Mr. D'Amico said that Corizon's policy of saving money for the State of Florida included reducing "specialty clinics, access to specialty clinics, frequency, and there were going to delay it as much as possible, and that's what their policy was."  Ex A at 98.  Mr. D'Amico explained that "before Corizon took over, there was a dermatologist and specialty clinic at Lake Butler Reception Medical Center."  *Id.*  "After Corizon took over, there [were] no more dermatologists at Lake Butler.  And even if a specialist wanted to refer you

to a dermatologist, like Dr. Montoya did . . . it was beyond his ability to do so." *Id.* at 98-99.

Mr. D'Amico has never had any treatment from or consultation with Dr. Owo.  Ex. A at 106.  Mr. D'Amico declares that he previously had been given passes for sun protection.  ECF No. 144 at 1; *see* also Ex. A at 50.  Dr. Salerno had recommended Mr. D'Amico have "long sleeved-shirts, a hat, sunscreen, and other protection from the sun because" he was "prone" to lesions.  Ex. A at 50.  He points out that he was denial "all" oncological care for eighteen months.  ECF No. 144 at 2.  Mr. D'Amico further highlights that Dr. Montoya, his prior oncologist, "diagnosed a mole on his nostril as being cancerous" in October 2014 but it was "left untreated until March 28, 2016."  *Id.*  Additionally, Mr. D'Amico points out that Dr. Montoya never made "CT scans a pre-condition" of receiving oncological care.  ECF No. 144 at 4.  He further advises that after having multiple excisions on March 28, 2016, he was informed that the lesion removed from his shoulder was also basal cell cancer.  ECF No. 144 at 7.

## IV.  Analysis

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual

punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d

251 (1976).  A "'serious' medical need is one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention."  Hill v.

Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct.

2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp.

269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is

determined by whether a delay in treating the need worsens the condition"

or "if left unattended, poses a substantial risk of serious harm."  Mann v.

Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40

F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.

2003)).  In this case, Dr. Owo does not dispute that Mr. D'Amico had

serious medical needs.  Without question, CLL, lymphoma, and cancer are

serious medical needs.  The dispute is whether Defendants were

deliberately indifferent to those needs.

The concept of deliberate indifference entails something more than

negligence, but is satisfied by something less than actions undertaken with

an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).

Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Ultimately, there are four requirements necessary to sustain an Eighth Amendment claim concerning a prisoner's need for medical care: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), cert. denied, 531 U.S. 1077 (2001); Farrow, 320 F.3d at 1243.  After showing a serious medical need, a "prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); see also Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment

without explanation or for non-medical reasons may also exhibit deliberate indifference.").

Medical malpractice does not constitute deliberate indifference. Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).  For example, in Estelle, the prisoner received treatment for his back injury (bed rest, muscle relaxants and pain relievers), but complained that more should have been done in the way of diagnosis, such as an X-ray or other tests. The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

When an inmate has received some medical attention or care and the dispute involves the adequacy of the care, federal courts are reluctant to second guess medical judgments and find an eighth amendment violation.

Harris, 941 F.2d at 1507.  As stated in McElligott, "[h]esitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs." 183 F.3d at 1259 (citing Waldrop, 871 F.2d at 1035).  Thus, liability cannot be avoided simply by pointing out that *some* medical care was provided, however cursory or insufficient that care.  *See* Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985); *see also* Hill, 40 F.3d at 1188–89 (stating that "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay."); Taylor, 221 F.3d at 1259–60.

Here, Dr. Owo contends that Mr. D'Amico's "medical needs were not ignored" and asserts that he has continued "to receive, adequate medical treatment while incarcerated at CCI (Columbia C.I.)"  ECF No. 117 at 24-25.  Dr. Owo argues that Mr. D'Amico has been evaluated and treated by numerous medical staff.  *Id.* at 25.

It is true that Mr. D'Amico was seen by medical staff on numerous occasions, yet as Mr. D'Amico points out, sick call visits and medical

appointments are not always the equivalent of medical care because a visit

without meaningful care is effectively the same as no care.  See McElligott,

182 F.3d at 1257 (holding that "a jury could find that the medication

provided to [the prisoner] was so cursory as to amount to no care at all.");

Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (stating that

"medical care that is so cursory as to amount to no treatment at all" is more

than "mere negligence"); Brown, 387 F.3d at 1351 (holding that completely

withdrawing prescribed treatment for prisoner diagnosed with HIV and

hepatitis and providing only clinic visits, despite his deteriorating condition,

was deliberate indifference).  In Brown v. Johnson, the Eleventh Circuit

rejected the argument that the case amounted to "nothing more than 'mere[

] disagree[ment] with the treatment prescribed.'"  387 F.3d at 1351.  Mr.

D'Amico's case is similar as he complained of a "complete withdrawal of

treatment."  Id.  It is true that Mr. D'Amico had frequent visits to the medical

department, but beyond scheduling lab work, he was not provided

treatment for CLL.  No evidence has been put forth showing any specific

medication provided to him for CLL.  Additionally, as outlined below,

beyond noting there were several lesions on his body, medical staff did not

offer Mr. D'Amico any treatment for those lesions for over a year.

An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989).  Here, Mr. D'Amico was transferred to Columbia C.I. on January 16, 2015, three months after Dr. Montoya diagnosed him with a skin lesion suspected to be cancer.  Dr. Montoya's Consultant's Report dated October 8, 2014, stated that Mr. D'Amico should have "surgery for excision" of the lesion.  That history was noted in numerous subsequent records by medical staff, but surgery was not scheduled.  Mr. D'Amico was seen by Dr. Marceus, Dr. Owo's predecessor, on February 2, 2015, four months after the diagnosis.  Dr. Marceus ordered additional lab work, but surgery was not scheduled or, apparently, not even discussed.  Moreover, there is no evidence to show that any examination took place of the skin lesion.  Nothing was done for the lesion until February 3, 2016, when Mr. D'Amico was examined by Dr. Ong, a plastic surgeon.  That examination resulted in an "urgent" request for approval of excisions.  The excisions were finally performed on March 28, 2016, which is 1 year, 5 months, 2 weeks, and 6

days after an oncologist recommended surgery.  That is an extraordinary delay.

Dr. Owo also contends that there is no Eighth Amendment claim due to delay, arguing that Mr. D'Amico "started receiving treatment the very first day" he arrived at Columbia Correctional Institution.  ECF No. 117 at 28-29. That argument ignores evidence that Mr. D'Amico had to wait over 17 months to have an enlarging skin cancer removed from his face.  By the time it was removed, multiple other lesions were also excised.  *Id.*; *see also* MR at 57.

"The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." Ancata, 769 F.2d at 703–04. Mr. D'Amico has provided evidence that Defendants knew of his need for care for the skin lesions, yet intentionally delayed that care, just as his need for long sleeved-shirts, a hat, and sun screen were delayed.  He testified that Defendants operated under a policy of saving money by reducing access to specialty clinics, the frequency of access, and by delay. There is delay in this case, and no explanation has been presented by Dr. Owo to explain or justify that delay.  "Intentional failure to provide service

acknowledged to be necessary is the deliberate indifference proscribed by the Constitution."  Ancata, 769 F.2d at 704 (finding that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out") (citing Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984)); Melton, 841 F.3d at 1226-27.

Dr. Owo also contends that this case is merely a dispute about medical care, in large degree because Mr. D'Amico was refusing a CT scan.  The scan has not been shown to have relevance to Mr. D'Amico's need for medical treatment for the skin lesion as the lesion was ultimately excised without a scan.  Instead, the scan appears to be important in providing treatment for Mr. D'Amico's abdominal issues and the "mass" on the lower side of the abdomen.

More importantly, this case does not amount to a dispute of medical care between Mr. D'Amico and his medical providers because surgery to excise the lesion was recommended and requested by Mr. D'Amico's treating oncologist, Dr. Montoya.  No evidence has been provided that the medical staff who examined, consulted, or visited with Mr. D'Amico did not believe Mr. D'Amico needed to have the lesion excised.  The argument that the Eighth Amendment claim should fail on that basis should be rejected.

In light of the foregoing, it is respectfully **RECOMMENDED** that the

motion for summary judgment filed by Dr. Owojuyigbe, ECF No. 117, be

**DENIED** as there is a genuine dispute of material fact.  It is further

recommend that this case be **REMANDED** for further proceedings prior to

setting the case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on February 13, 2017.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**