## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**STEVEN F. D'AMICO,**

      **Plaintiff,**

**vs.**                           **Case No. 4:15cv127-MW/CAS**

**DR. VERNON MONTOYA,**
**DR. A. BUCARELLI,**
**DR. ALFONSO MARTINEZ,**
**DR. P. MARCEUS,**
**DR. HEZEKIAH OWOJUYIGBE,**
**and JULIE JONES,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Previously, Defendant Dr. Hezekiah Owojuyigbe filed a motion for summary judgment, ECF No. 117, which was denied because there were genuine issues of material fact. ECF Nos. 175, 178. A "notice of stipulation and motion to dismiss" filed by Dr. Owojuyigbe, ECF No. 185, has also been denied. ECF Nos. 192, 194.

Several other motions for summary judgment remain pending in this case. This Report and Recommendation deals only with the motion for summary judgment filed by Defendant Montoya. ECF No. 127. Plaintiff

was given a deadline to respond to the motion after conclusion of the

discovery period, and advised of his obligation to respond under Rule 56

and Local Rule 56.1.  ECF No. 129.  Plaintiff, proceeding pro se at the

time,[1] filed a response in opposition to Defendant Montoya's motion, ECF

No. 143, and Dr. Montoya filed a reply, ECF No. 146.  The motion is ready

for a ruling.

## I. Allegations of the Complaint

Plaintiff Steven D'Amico's second amended complaint [hereinafter

"complaint"] presents claims under the Eighth Amendment.  ECF No. 13.

Mr. D'Amico contends Defendants have been deliberately indifferent to his

medical needs and have denied him "necessary medical care and

medications."  *Id.* at 10.  Mr. D'Amico alleges that in 2007, he was

diagnosed with Chronic Lymphocytic Leukemia (CLL), a "slow growing

blood cancer . . . ."  *Id.* at 5.  Mr. D'Amico asserts that CLL cannot be

cured, "but can be managed with proper treatment for 25 years."  *Id.*

Mr. D'Amico began a rigorous course of treatment in 2007 which included

monoclonal anti-body therapy and the medication Rituxan.  *Id.*

Mr. D'Amico said that those quarterly treatments managed his cancer for

---

[1] Plaintiff is now represented by counsel, although the summary judgment
materials were filed prior to counsel's appearance in this case.

seven years.  *Id.*  In 2008, Mr. D'Amico also had "numerous skin lesions" removed and was prescribed sunblock, hat, long sleeve shirts, and diphorhydramine because, as a cancer patient, he "is at greater risk for developing secondary cancers."  *Id.*

In 2012, the Department of Corrections contracted with Corizon to provide health care to inmates in its custody.  *Id.* at 6.  Following that change, Mr. D'Amico was no longer provided "skin protection passes" and was no longer seen by a dermatologist.  *Id.*  Mr. D'Amico alleges that Corizon did not make a dermatologist available to "inmates in need of skin care."  *Id.* at 8.  In 2014, while housed at Taylor Correctional Institution, Mr. D'Amico again sought skin protection, but the request was denied by Defendant Bucarelli who Mr. D'Amico said was "dismissive."  ECF No. 13 at 6.  Since being denied skin protection, Mr. D'Amico states he was "exposed to long periods of sun [daily] at Taylor C.I. . . . and developed countless more moles and blemishes which have never been examined by a Dermatologist or any medical staff."  *Id.* at 7.

In October 2014, Mr. D'Amico's Rituxan maintenance treatments were "suddenly discontinued" by Defendant Montoya.[2]  *Id.* at 8.

---

[2] Dr. Vernon Montoya was an Oncologist employed at the Reception and Medical Center in Lake Butler, Florida.  ECF No. 13 at 2.

Mr. D'Amico said he was told that pursuant to "policy," he was supposed to receive Rituxan for only two years. *Id.* Mr. D'Amico reports that he has not seen an oncologist since that time and has "not received medical care of any kind for CLL since October 8, 2014." *Id.* Mr. D'Amico complains that the "lymph nodes in his neck have become enlarged and sore since the Rituxan treatments were stopped." *Id.* He alleges that failing to treat CLL allows it "to progress at great risk to Plaintiff." *Id.*

Mr. D'Amico also contends that Defendant Montoya suspected he had a cancerous skin lesion on his face in October 2014, but "was prevented" from providing treatment, at least in part, because Corizon did not make a dermatologist available. ECF No. 13 at 8. Mr. D'Amico says he lives under emotional duress because the lesion has continued to develop and, also, "because of another lesion on the inside of his mouth which has gone untreated." *Id.* at 9. Mr. D'Amico reported the lesion to Defendant Montoya at his last cancer clinic appointment on October 8, 2014, at R.M.C., but Mr. D'Amico contends the "lesion has been allowed to grow to the point where it now gets bitten when Plaintiff eats food." *Id.*

Mr. D'Amico alleged that as of July 2015 when the complaint was filed, he was confined at Columbia C.I. Annex. ECF No. 13 at 9. Despite

having "submitted sick call requests and [having] filed grievances regarding the discontinuance of Rituxan treatments for CLL, and other cancer concerns" he still "has not received any meaningful medical care at Columbia." *Id.*  Mr. D'Amico says he is still denied "passes for sunblock, hat, long sleeve shirts, and skin examinations . . . ." *Id.*[3]

## II.  Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

---

[3] Procedurally, Dr. Owojuyigbe ["Dr. Owo"] was substituted as a Defendant pursuant to Rule 25(d) for Dr. Marceus, the chief health officer at Columbia Correctional Institution.  *See* ECF Nos. 59, 98.  Claims proceed against Dr. Marceus in his individual capacity only and against Dr. Owo in his official capacity only.

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp.</u>, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[4] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554; <u>Beard v. Banks</u>, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case. <u>Hickson Corp. v. Northern Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless

---

[4] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts

and disputed matters of professional judgment."), but "only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

## III.  The relevant Rule 56(e) evidence

Mr. D'Amico is currently 57 years of age and entered the custody of the Department of Corrections in 2006.  ECF No. 117-1 at 5, 9 (ECF No. 117, Ex. A ["TR"].[5]  "Dr. Vernon Montoya is a hematologist/oncologist." ECF No. 127 at 2.  In 2007, Dr. Montoya diagnosed Mr. D'Amico with CLL (Chronic Lymphatic Leukemia).  TR at 17.  Dr. Montoya put Mr. D'Amico on an "intensive regimen, which included Rituxan and several other chemos" which lasted for approximately six months.  <u>Id.</u> at 17-18.  Afterwards, he was "put on a reduced maintenance schedule of Rituxan every three

---

[5] Plaintiff's deposition transcript was submitted with Dr. Owojuyigbe's motion for summary judgment, ECF No. 117.  It is referenced in, and relied upon, by Dr. Montoya in his motion for summary judgment as well.  ECF No. 127.  The transcript will be referenced as "TR."  References to exhibits will cite to the actual page number of the exhibit and not the page number on CMECF as Mr. D'Amico does not have access to the Court's electronic docket.

months" and seen by Dr. Montoya every three months thereafter for seven years. *Id.* at 18, 26.

During those seven years, Mr. D'Amico believed that his symptoms were controlled because of the therapy regimen. *Id.* at 18. He explained in his deposition that he had been experiencing "very swollen" glands, but after receiving "whatever array of chemotherapy [Dr. Montoya] gave [him], they went right down." *Id.* Dr. Montoya discontinued Mr. D'Amico's treatment with Rituxan on October 8, 2014, and, indeed, stopped treating Mr. D'Amico on that date as well. *Id.* at 18, 20-21. On what would turn out to be Mr. D'Amico's final visit with Dr. Montoya prior to filing this lawsuit,[6] "he discontinued the Rituxan and all contact with him." *Id.* at 21.

Dr. Montoya told Mr. D'Amico that he "was only supposed to be on Rituxan for two years" but had been on it for seven years. *Id.* at 22. A notation in the medical records reveals Dr. Montoya said that "the newest medical evidence shows that a patient needs to be on [Rituxan] for a maximum of two years." *Id.* However, Mr. D'Amico testified in his deposition that although "many things . . .are written into a record" they are not stated verbally. *Id.* at 23. Mr. D'Amico maintains that Dr. Montoya did

---

[6] This lawsuit was initiated on March 5, 2015. ECF No. 1.

not tell him he was discontinuing the Rituxan because of new medical evidence but, rather, because of "policy." *Id.* at at 23-24.  Additionally, Mr. D'Amico said that when he met with Dr. Sweetser (another oncologist) at Lake Butler, he also told Mr. D'Amico that he should not have been on Rituxan for seven years.  *Id.* at 100, 102-103.

Mr. D'Amico also testified that staff "would make remarks about how expensive" Rituxan was.  *Id.* at 63.  He said there were "incidents where they were concerned about the availability, that the therapies were becoming scarce, the costs were going up, how expensive they are, and how there's a shortage."  *Id.*  He was the term that was used on one occasion was that "there was a shortage of Rituxan."  *Id.*

Dr. Bucarelli submitted an affidavit which explained Mr. D'Amico's medical records.  ECF No. 117, Ex. B (ECF No. 117-2 at 3).  Dr. Bucarelli said that on October 8, 2014, when Mr. D'Amico was seen by Dr. Montoya for a follow up visit, Dr. Montoya noted that Mr. D'Amico "had a skin lesion on his nose consistent with basal cell carcinoma (BCC)."  Ex. B at 3.  The plan was for Dr. Montoya to follow up with Mr. D'Amico in one month after the completion of "lab work" and a "CT scan of the chest, abdomen, and pelvis."  *Id.*  As reflected in the Consultant's Report for October 8, 2014,

Dr. Montoya also planned to refer Mr. D'Amico "to surgery for excision" of the skin lesion on his nose.  *Id.;* MR at 1.[7]  However, Mr. D'Amico was transferred from Taylor Correctional Institution to Cross City Correctional Institution on October 24, 2014.  Ex. B at 4.  Mr. D'Amico's lab work was completed on October 31, 2014.  *Id.*

Mr. D'Amico testified that he knew "there was a thing there" on his nose, but had not been concerned about it.  TR at 35.  Mr. D'Amico thought it "was a mole or something."  *Id.*  However, when Dr. Montoya saw the lesion on the right side of his nose and face, he "blurted out 'you have a cancer.'"  *Id.* at 34-35.  Dr. Montoya "started to writ a consult" for a dermatologist, but the "nurse said there isn't a dermatologist."  *Id.* at 35-36.  Dr. Montoya then referred him to a surgeon.  *Id.* at 36.

On November 6, 2014, Mr. D'Amico was seen by Dr. Llorens who "noted Dr. Montoya's plan to discontinue Rituxan and order labs and a CT scan."  Ex. B at 4 (ECF No. 117-2).  Dr. Llorens submitted a consultation request for the CT scan, which "was approved and an appointment was made for November 14, 2014."  *Id.*; *see also* MR at 6.  Mr. D'Amico,

---

[7]  Mr. D'Amico's medical records were submitted as Exhibit A to Dr. Bucarelli's affidavit, ECF No. 117-2 (referenced as Exhibit B).  They are referenced as MR and the page number of the exhibit as shown on the bottom, right side of the page.  For example, MR-1 is Exhibit A, page 1, located at ECF No. 117-2 at 14.

however, "refused to go" to the CT scan.  Ex. B at 5 (citing MR at 7).  The

medical records indicate that Mr. D'Amico signed a refusal form after being

"educated on the importance of the test."  Ex. B at 5; MR at 10.  In his

deposition, Mr. D'Amico explained that he refused to have the scan

because he "already had cancer" and did not "need any extra radiation."

TR at 54.  Instead, Mr. D'Amico asked for an MRI, as he had done on

several occasions.  *Id.* at 54-55.  Mr. D'Amico said that in the beginning, he

"was getting CAT scans the whole time, and the frequency concerned" him.

*Id.* at 55.  So he would request that Dr. Montoya give him an MRI instead

of CAT scans, "but that never happened."  *Id.* at 55.  Mr. D'Amico has

clarified that his "refusal was not a new" development as he had done so

"for years without Defendant Montoya stopping all onocological [sic] care"

for him.  ECF No. 143[8] at 2.  Mr. D'Amico declares that any assertion that

his oncological care "was stopped because he refused a CT scan is a

sham" because he had "refused CT scans for years."  *Id.*[9]

---

[8] Mr. D'Amico's response, ECF No. 143, in opposition to Dr. Montoya's summary judgment motion is the equivalent of a declaration as it is sworn under penalty of perjury.  ECF No. 143 at 6.

[9] In addition to the instant response to Dr. Montoya's summary judgment motion, Mr. D'Amico also said in response to Dr. Owojuybe's motion that Dr. Montoya never made "CT scans a pre-condition" of receiving oncological care.  ECF No. 144 at 4.

Mr. D'Amico also refused a medical appointment on November 18, 2014.  Ex. B at 5 (citing to MR at 10).[10]  The medical records include a notation that security called medical, informing them that Mr. D'Amico "did not want to go on medical run in AM."  MR at 10.  Mr. D'Amico testified that was a "complete fabrication" and he said he did not refuse to go to medical for any appointments.  TR at 125-126.  He said that he had been on pain medication and on the last day, a nurse told him: "[I]if you come here at 12:01, you're not getting anything."  *Id. at 125.*  The nurse said: "You need to get here before 12:00 midnight because your prescription ends 12:00 midnight."  *Id.*  "You come one minute past, you're not getting anything."  *Id.*  Mr. D'Amico said that he relayed that information to the dorm officer, but the officer waited and did not come to get him until "1:00 in the morning."  *Id.*  Mr. D'Amico said he told the officer: "I don't need to go to medical now, because the nurse told me not to come if it's past 12:00."  *Id.* at 125-126.

Notwithstanding, Mr. D'Amico did acknowledge that he refused to meet with Dr. Hagan, the surgeon referred by Dr. Montoya.  TR at 36-38.  Mr. D'Amico said he refused to see him because he was "the same

---

[10] The purpose of that appointment was not explained in Dr. Bucarelli's affidavit. ECF No. 117-2 (Ex. B).

surgeon that left surgical clips in [his] neck when he did the lymph node biopsy . . . back in 2007 . . . ." *Id.* at 36; *see also* p. 38. Mr. D'Amico also explained that in addition to not wanting to see Dr. Hagan, he thought he "should see a dermatologist who would do a biopsy" which was "more in line" with Dr. Montoya's original plan. *Id.* at 38. Eventually, a biopsy was taken from the right side of Mr. D'Amico's nose. Ex. B at 8. "The diagnosis was atypical basaloid neoplasm consistent with BCC [basal cell carcinoma]." *Id.* On March 28, 2016, Dr. Ong excised the "BCC of the right nasal groove and multiple hyperpigmented lesions of the head, right ear, right shoulder, back, chest, and forearm." *Id.* at 11.

Mr. D'Amico saw Dr. Llorens on November 20, 2014, for complaints of neck pain and his refusals for treatment. Ex. B at 5. That appointment was a follow up to Plaintiff's sick call visit on November 12, 2014, during which he complained of back and neck pain, a "small lump" on the inner cheek, and swelling on right lower leg. MR at 8-9; Ex. B at 5. The nurse noted that Mr. D'Amico had a "possible growth inside" his right cheek and referred him to the doctor for follow up. MR at 9. The record also includes the notation: "He knows he has lymphoma & is worried he now has cancerous lesions in his mouth and on lower [right] leg." *Id.*

Mr. D'Amico was transferred from Cross City Correctional Institution to Charlotte Correctional Institution on December 8, 2014.  Ex. B at 5. After having lab work on December 10 and 24, 2014, Mr. D'Amico was seen by Dr. Hemphill on January 9, 2015.  *Id.*  Dr. Hemphill noted in the medical records that Mr. D'Amico "had refused to see a general surgeon for the lesion on his nose and refused the CAT scans because he was worried about the radiation."  Ex. B at 5 (citing MR at 16).  Mr. D'Amico was transferred to Columbia Correctional Institution on January 16, 2015. ECF No. 117, Ex. D (ECF No. 117-4).

After completing more lab work on January 29, 2015, Mr. D'Amico was seen by Dr. Marceus on February 2, 2015.  Ex. B at 6.  Dr. Marceus determined that Mr. D'Amico's "CLL was stable."  *Id.* (citing MR at 20).  He "ordered additional labs and a follow up" in six months.[11]  *Id.*  Mr. D'Amico previously disputed that his CLL was "stable" based on the January 2015 lab report which revealed several abnormal findings in hematology.  ECF No. 144 at 2 (citing to MR at 19); *see* also July 2015 lab report, Ex. A at 26. In response to Dr. Montoya's motion, Mr. D'Amico said that Dr. Marceus never told him he was "stable," but instead, said "something to the effect,

---

[11] It was during this time period that Mr. D'Amico initiated this litigation and filed the original complaint, ECF No. 1, on March 5, 2015.

'your blood work looks good.'" ECF No. 143 at 2.  Mr. D'Amico said that he

pressed him for more information, and "he merely mentioned blood fat,

sugar, electrolytes being at good levels."  *Id.*  Dr. Marceus "never

mentioned the white blood cell counts emblematic of luekemia [sic]."  *Id.*

Mr. D'Amico contends that hematology test results submitted in this record

reveals his "blood cell counts vary from below normal to barely normal" and

he contends his "leukemia was not 'stable,' and certainly not in remission

as suggested by" Department of Corrections officials.  ECF No. 143 at 3

(citing to ECF No. 113-1, Ex. E).

On March 2, 2016, Mr. D'Amico was transported to the Reception

and Medical Center [RMC] to be evaluated by Dr. Sweetser, another

oncologist.  TR 32-33.  Dr. Sweetser noted Mr. D'Amico's diagnosis from

the medical records, directed that he return for follow-up visits every four

months, but did not prescribe any medication to treat Mr. D'Amico's CLL.

TR at 33-34.  Mr. D'Amico asked Dr. Sweetser about the Rituxan, and he

said that Mr. D'Amico should not "have received it for seven years"

because "that was too many years."  TR at 103.

Dr. Montoya points out that since October 8, 2014, when he

discontinued Rituxan, no physician has told Mr. D'Amico that his "life

expectancy" was "reduced as a result of not being on the Rituxan."  TR at

34.  However, Mr. D'Amico testified in his deposition that since October 8,

2014, he had not "been prescribed . . . any medicine to assist with [his]

swollen lymph nodes."  *Id.* at 31.  Mr. D'Amico was questioned in his

deposition about whether any doctor, oncologist or not, told him that he

"needed to be back on Rituxan."  TR at 136.  Mr. D'Amico testified that no

doctor had said that, but asserted that "other doctors really couldn't answer

[the question of whether he needed to be back on Rituxan] because they

said they weren't an oncologist."  *Id.*

Although not cited by Dr. Montoya in his motion for summary

judgment, the record[12] discloses that Mr. D'Amico went to sick call on April

20, 2015, complaining of "swollen lymph nodes in his neck and abdominal

pain."  Ex. B at 6.  The medical record notes Mr. D'Amico's chief complaint

was a "hard mass on lower side of abdomen."  Ex. E at 10.  He was

scheduled to see the doctor for further evaluation on April 29, 2015, *see id.*

and MR at 22, but the appointment was rescheduled due to an unexplained

---

[12] This additional evidence was relied upon in previously ruling on the motion for
summary judgment filed by Dr. Owojuyigbe.  *See* ECF Nos. 117, 175, and 178.  It is
included here to provide for a complete review.  Mr. D'Amico did, however, assert
several of these facts in his response.  ECF No. 143 at 4-6.  These events occurred
after case initiation.

"security issue."  MR at 23; Ex. B at 6; Ex. E at 12.[13]  The notation for the

"Doctor's Clinic" for April 29, 2015, was "enlarged & painful lymph nodes -

ABD mass - migraines."  Ex. E at 12.

Mr. D'Amico was seen by ARNP Pastora in the Doctor's Clinic on

May 6, 2015, for "complaints of discomfort on the right side of his neck and

abdominal pain."  Ex. B at 6; Ex. E at 14.  Pastora noted his history of CLL

which had been treated with Rituxan for seven years and noted

Mr. D'Amico was requesting a refill.  MR at 24.  Pastora also "noted that

Dr. Montoya had recommended a follow up in November with blood work

results and CT scan results, but [Mr. D'Amico] refused to have the CT scan

done."  Ex. B at 6; MR at 24.  Pastora's examination of Mr. D'Amico

revealed "enlarged, tender lymph nodes in his neck."  *Id.*  Mr. D'Amico was

scheduled for an ultrasound of the abdomen and lab work, and she

"planned to submit a consult with Dr. Montoya with the lab work results."

*Id.* (citing MR at 24); *see also* Ex. E at 14.

Following Mr. D'Amico's lab work in July 2015, he was seen by

ARNP Pastora in the chronic care clinic on August 17, 2015.  Ex. B at 7.

Pastora noted in the medical records that his "CLL control was good/fair."

---

[13] Exhibit E was also submitted with ECF No. 117 and contains Mr. D'Amico's medical records.  *See* ECF No. 117-5.

*Id.*  She also noted that an appointment would be scheduled for a biopsy of the skin lesion.  MR at 28.  Another notation in the record states that a consult would be written for Dr. Montoya "after blood work done."  *Id.*

The lab work was done on August 20, 2015.  Ex. B at 7.  Mr. D'Amico had an abdominal ultrasound on September 18, 2015, for his complaints of abdominal pain.  *Id.*  The results were normal, *id.*, and reviewed by ARNP Pastora on September 23, 2015.  MR at 32.  The medical record notes that on October 29, 2015, a formal grievance was answered, but there is no indication that Mr. D'Amico was seen by medical until he reported to sick call on November 7, 2015.  MR at 32-33.  Nurse Hartley noted in the chart that Mr. D'Amico was complaining of "stomach pain and nobody told" him the results of the ultrasound.  MR at 33.  The nurse said that Mr. D'Amico was not complaining of pain but seemed angry about his medical care.  *Id.*  It was also noted that Mr. D'Amico was "talking about 'statute of limitations'" but did "not appear to be in any distress at [that] time."  *Id.*  Nurse Hartley determined no treatment was necessary at that time and noted that an order had been entered for a biopsy on his nose.  *Id.*  Finally, the record reveals that Mr. D'Amico was requesting "a hat, sunscreen,

Excedrin for headaches and to see the [Doctor]."  *Id.*  Nurse Hartley said

Mr. D'Amico's chart would be referred to the doctor.  *Id.*

On November 9, 2015, an Excedrin order was written and

Mr. D'Amico was scheduled for an evaluation by the doctor.  *Id.*; *see also*

Ex. B at 8.  On the following day, November 10th, Mr. D'Amico again went

to sick call asking why he had not had a follow up appointment with the

doctor.  MR at 33.  He was informed that he had an appointment

scheduled.  *Id.*  The sick call visit ended due to Mr. D'Amico "insulting

staff."  Ex. B at 8; *see also* MR at 33.

On November 18, 2015, Mr. D'Amico was seen by Dr. Pinero in the

doctor's clinic for his complaints of occasional abdominal pain on the left

side.  Ex. B at 8 (citing MR at 34).  Dr. Pinero noted the "abdominal

ultrasound was within normal limits."  *Id.*  On November 25, 2015,

Mr. D'Amico was again seen by Dr. Pinero, this time for the lesion on his

nose.  Ex. E at 27.

The biopsy of Mr. D'Amico's nose was performed on December 18,

2015.  Ex. B at 8 (citing MR at 35).  "The diagnosis was atypical basaloid

neoplasm consistent with BCC."  *Id.* at 8.  Dr. Pinero reviewed the biopsy

results and evaluated Mr. D'Amico again on December 29, 2015.  Ex. E at 30.

On January 15, 2016, ARNP Dawson submitted a consultation request for a plastic surgeon to evaluate Mr. D'Amico based on the results of the biopsy.  Ex. B at 9.  The provisional diagnosis stated on the request was "basal cell cancer" on the right side of the nose.  MR at 41.  The request appears to indicate the "small lesion" had increased in size since "last year."  *Id.*  Mr. D'Amico also reported in his deposition that the lesion had grown by "fifty percent."  Ex. A at 69.  He explained: "It wasn't twice the size, but it was half of what it was bigger than it was prior."  *Id.*  The request was approved and an appointment scheduled for February 3, 2016.  Ex. B at 9.

On January 26, 2016, the senior dentist at Columbia Correctional Institution Annex submitted another consultation request for a biopsy due to Mr. D'Amico's "concern about a nodule on the inside of his right cheek that appeared to be fibroma."  Ex. B at 9; *see also* MR at 42.

Mr. D'Amico saw Dr. Ong, a plastic surgeon, on February 3, 2016. Ex. B at 9.  Dr. Ong noted "BCC of the right nose groove, a skin lesion on the lower back, and a mass in the right buccal area (cheek)."  *Id.*  Dr. Ong

submitted an urgent request for approval of excisions.  *Id.*; *see also* MR at

445-46.  The medical record also reveals that an "urgent" request for the

excision of several areas was submitted by ARNP Dawson on February 3,

2016.  MR at 44.  ARNP Dawson also reviewed his chart on February 9,

2016.  Ex. E at 34-36.  A notation in the chart reflects that Mr. D'Amico

would need a "CAT scan of abdomen" for a follow-up appointment with

Dr. Montoya.  *Id.* at 36.

Mr. D'Amico was examined by Dr. Render, a dentist, on February 10,

2016, "for complaints of a slowly enlarging nodule on the right buccal

mucosa."  Ex. B at 9; *see also* MR at 49.  Dr. Render performed "an

excisional biopsy" of the area which revealed "oral fibroma."  Ex. B at 9-10.

> Oral fibroma is a common benign scar-like reaction to
> persistent long-standing irritation in the mouth.  The most
> common location of oral fibromas is on the inside of the cheek
> where the upper and lower teeth meet.  Oral fibroma is usually
> due to chronic irritation such as cheek or lip biting or rubbing
> from a rough tooth.  Oral fibromas do not develop into oral
> cancer.

Ex. B at 10.

On February 11, 2016, Mr. D'Amico was seen by ARNP Pastora to

evaluate the need for a CT scan and oncology consult.  Ex. B at 10.  ARNP

Pastora noted that Mr. D'Amico had a history of CLL and BCC, and had

previously refused a CT scan.  Mr. D'Amico was still refusing the scan but

wanted to see an oncologist.  *Id.*  An oncology consult was submitted, *see*

MR at 53, and ARNP Pastora issued him passes for sunscreen, a straw

hat, and a long sleeve shirt.  Ex. B at 10; *see also* MR at 51-52.

On March 2, 2016, Mr. D'Amico was examined by Dr. Matthew

Sweetser, an oncologist.  Ex. B at 11.  He noted Mr. D'Amico's history of

"CLL/low grade lymphoma" since 2007.  MR at 54.  He submitted a request

for a follow-up in four months, and an appointment was scheduled for July

5, 2016.  *Id.* at 54-55; Ex. B at 11.

As noted above, Mr. D'Amico was seen by Dr. Ong for the excision

procedure on March 28, 2016.  Ex. B at 11.  Not only did Mr. D'Amico have

an excision on his nose, but "multiple other hyperpigmented lesions of the

head, right ear, right shoulder, back, chest, and right forearm" were

excised as well.  *Id.*; *see also* MR at 57.  Mr. D'Amico points out that this

excision occurred "18 months after" Dr. Montoya diagnosed him with

cancer (on October 8, 2014).  ECF No. 143 at 3.

Mr. D'Amico "also had blood drawn for labs."  Ex. B at 11.  ARNP

Dawson reviewed Mr. D'Amico's lab work on April 4, 2016, and found his

white blood cells were elevated.  Ex. B at 11.  Mr. D'Amico was prescribed

Keflex and was to have follow-up labs in a week.  *Id.*  The follow-up lab

work was done on April 11, 2016.  *Id.* at 12.

On April 6, 2016, Mr. D'Amico was seen in sick call with complaints

of chest pain, dizziness, numbness in his left arm, and a headache.  Ex. B

at 11.  Mr. D'Amico said he has experiencing "stress" as a result of not

receiving "necessary medical care for his cancers . . . ."  ECF No. 143 at 4.

The nurse took his vitals, which were normal, and performed an EKG.  Ex.

B at 11.  The nurse also "requested the ARNP to evaluate [Mr. D'Amico]

that day, but the appointment was rescheduled due to security locking

down [the] facility."  *Id.*

Mr. D'Amico saw ARNP Dawson on April 13, 2016, for chest pain.

Ex. B at 12.  Dawson noted that EKG results were "atypical due to anxiety."

*Id.*  She also removed the sutures from the excision sites.  *Id.*

On May 1, 2016, Mr. D'Amico was seen in sick call for complaints of

another lesion on the right side of his nose.  Ex. B at 12.  "The nurse

documented lichenification - thickening of skin accompanied by

accentuation of skin markings."  *Id.*; *see also* MR at 65.

"Beginning in April 2016, Centurion began incrementally replacing

Corizon as the contracted health care provider for many prisons and jails in

Florida." Ex. B at 13. "On May 8, 2016, Centurion took over healthcare operations . . . from Corizon." *Id.* "Corizon no longer has any role in the care" or treatment of Mr. D'Amico. *Id.*

Mr. D'Amico testified in his deposition that when Corizon took over providing medical care to inmates within the Department of Corrections, transferring inmates to an outside hospital or medical facility to see a specialists was done "far less frequently." TR at 97. Mr. D'Amico said that Corizon's policy of saving money for the State of Florida included reducing "specialty clinics, access to specialty clinics, frequency, and there were going to delay it as much as possible, and that's what their policy was." TR at 98. Mr. D'Amico explained that "before Corizon took over, there was a dermatologist and specialty clinic at Lake Butler Reception Medical Center." *Id.* "After Corizon took over, there [were] no more dermatologists at Lake Butler. And even if a specialist wanted to refer you to a dermatologist, like Dr. Montoya did . . . it was beyond his ability to do so." *Id.* at 98-99.

In his response to Dr. Montoya's motion, Mr. D'Amico notes that on August 5, 2016, he was transported to RMC and seen by Dr. Montoya again. ECF No. 143 at 4. Dr. Montoya examined him, including the lymph

nodes in Mr. D'Amico's neck and armpits, something Mr. D'Amico

contends Dr. Montoya did not do previously on October 8, 2014.[14]  ECF

No. 143 at 4.  Dr. Montoya examined him again on September 29, 2016, at

RMC and told him that his CT Scan was negative and he would see him

again in six months.  ECF No. 143 at 5.  As he was being led out the door,

Mr. D'Amico attempted to ask about his swollen glands.  *Id.*  Dr. Montoya

said, "The swelling is not significant."  *Id.*  Mr. D'Amico declares, however,

that his lymph nodes "are nearly as swollen and sore as they were" in 2007

when Dr. Montoya first treated him.  *Id.*  Mr. D'Amico reports that his

"swollen lymph nodes were a cause of great concern" back then.  *Id.*

　　　Mr. D'Amico previously declared that he had been given passes for

sun protection.  ECF No. 144 at 1; *see* also Ex. A at 50.  Dr. Salerno had

recommended Mr. D'Amico have "long sleeved-shirts, a hat, sunscreen,

and other protection from the sun because" he was "prone" to lesions.  Ex.

A at 50.  He said that after having multiple excisions on March 28, 2016, he

was informed that the lesion removed from his shoulder was also basal cell

cancer.  ECF No. 144 at 7.

---

[14] Mr. D'Amico listed that date as October of 2016, but it is clear that was in error as he has consistently complained about his "last visit" with Dr. Montoya before filing this lawsuit, which occurred on October 8, 2014.

## IV.  Analysis

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm."  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Here, Dr. Montoya neither denies nor confirms that Mr. D'Amico had serious medical needs.  ECF No. 127.  Nevertheless, without hesitation it is concluded that Mr. D'Amico's CLL, basal cell carcinoma, and lymphoma

are serious medical needs.  The dispute between these parties, thus, turns

on whether Dr. Montoya was deliberately indifferent to those needs.  There

are two main issues in this case concerning Dr. Montoya's care: (1) the

discontinuation of Rituxan and (2) the referral to a surgeon rather than to a

dermatologist.  *See* ECF No. 127 at 3.  Those issues are not disputed by

Mr. D'Amico.[15]

The concept of deliberate indifference entails something more than

negligence, but is satisfied by something less than actions undertaken with

an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978

(1994).  Deliberate indifference has been described as a culpable state of

mind of the defendant to unnecessarily and wantonly inflict pain or harm to

a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501

U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

---

[15] Mr. D'Amico has made conclusory assertions, not supported by any facts
demonstrating personal knowledge, that Dr. Montoya "planned" to discontinue providing
more oncological care to him on October 8, 2014.  ECF No. 143 at 1; *see also* ECF No.
143 at 4 (stating that Dr. Montoya "planned never to see him again.").  Those assertions
are not supported by the record evidence which demonstrate Dr. Montoya ordered lab
work and a CT scan, planning to follow up with Mr. D'Amico in one month.  ECF No.
117-2 at 3.  Mr. D'Amico has come forward with no evidence to support his assertion
that Dr. Montoya "kicked [him] to the curb."  TR at 27; *see also* ECF No. 146 at 2-3
(Dr. Montoya's reply).  Mr. D'Amico acknowledged in his deposition that he had "no
idea" why he did not see Dr. Montoya for so long after October 8, 2014, and that it
could have been because of "an issue related to a contract, or personal preference, or"
he moved.  TR at 28.

Ultimately, there are four requirements necessary to sustain an

Eighth Amendment claim concerning a prisoner's need for medical care:

"an objectively serious need, an objectively insufficient response to that

need, subjective awareness of facts signaling the need, and an actual

inference of required action from those facts."  Taylor v. Adams, 221 F.3d

1254 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001); Farrow, 320

F.3d at 1243.  After showing a serious medical need, a "prisoner must

prove three facts: (1) subjective knowledge of a risk of serious harm; (2)

disregard of that risk; and (3) by conduct that is more than mere

negligence."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)

(citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); *see also*

Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a]

defendant who unreasonably fails to respond or refuses to treat an

inmate's need for medical care or one who delays necessary treatment

without explanation or for non-medical reasons may also exhibit deliberate

indifference.").

Medical malpractice does not constitute deliberate indifference.

Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in

medical opinion between the prison's medical staff and the inmate as to the

latter's diagnosis or course of treatment support a claim of cruel and

unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.

1991) (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).

For example, in Estelle, the prisoner received treatment for his back injury

(bed rest, muscle relaxants and pain relievers), but complained that more

should have been done in the way of diagnosis, such as an X-ray or other

tests.  The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

When an inmate has received some medical attention or care and

the dispute involves the adequacy of the care, federal courts are reluctant

to second guess medical judgments and find an eighth amendment

violation.  Harris, 941 F.2d at 1507.  As stated in McElligott, "[h]esitation

does not mean, however, that the course of a physician's treatment of a

prison inmate's medical or psychiatric problems can never manifest the

physician's deliberate indifference to the inmate's medical needs." 183

F.3d at 1259 (citing Waldrop, 871 F.2d at 1035).  Thus, liability cannot be

avoided simply by pointing out that *some* medical care was provided,

however cursory or insufficient that care.  *See* <u>Ancata v. Prison Health</u>

<u>Servs., Inc.</u>, 769 F.2d 700, 704 (11th Cir. 1985); *see also* <u>Hill</u>, 40 F.3d at

1188–89 (stating that "delay in medical treatment must be interpreted in

the context of the seriousness of the medical need, deciding whether the

delay worsened the medical condition, and considering the reason for

delay."); <u>Taylor</u>, 221 F.3d at 1259–60.

In this case, Dr. Montoya argues that his decision to discontinue

Mr. D'Amico's Rituxan "was based upon the newest medical evidence

concerning effective duration of administration and, thus, constituted

Dr. Montoya's medical judgment."  ECF No. 127 at 15.  He asserts that

such judgment "evidences a state of mind in which he sought to treat

[Mr. D'Amico] in accordance with the latest standards of care, for the

health and well-being of his patient."  *Id.* at 16.  Moreover, "even if

Dr. Montoya's decision to discontinue the Rituxan was motivated by

'policy,' . . . a state of mind that sought compliance with proper protocol" is

not a "state of mind that sought to 'unnecessarily and wantonly inflict pain

or harm."  *Id.*  Dr. Montoya further contends that there is no record

evidence to indicate he "had 'subjective knowledge of a risk of serious harm' to [Mr. D'Amico] by discontinuing Rituxan."  ECF No. 127 at 17.

In response, Mr. D'Amico has not come forward with any evidence to show that discontinuing Rituxan was either improper or the result of disregarding a risk of serious harm to Mr. D'Amico.  There is no evidence that any medical personnel have opined that Mr. D'Amico should again be taking Rituxan but, rather, several medical personnel concurred that he should not have been taking it for seven years.  More importantly, the decision to continue or discontinue a prescription constitutes medical judgment, and disagreeing with that judgment is the quintessential difference of medical opinion which is insufficient to state a claim under the Eighth Amendment.

Secondly, Mr. D'Amico's claim against Dr. Montoya is also based on the decision to refer him to a surgeon and not a dermatologist.  In light of the undisputed evidence that a dermatologist was not available, such a decision cannot constitute deliberate indifference.  Mr. D'Amico was not abandoned, but given a referral for a surgeon to remove a cancerous skin lesion.  It was Mr. D'Amico's disagreement with the surgeon selected that prevented him from receiving treatment, not any action or omission by

Dr. Montoya.  There is no evidence presented which reveals Dr. Montoya ignored Mr. D'Amico's medical needs or failed to provide him treatment. Mr. D'Amico was transferred to Columbia C.I. on January 16, 2015, three months after Dr. Montoya diagnosed him with a skin lesion suspected to be cancer.  Dr. Montoya's Consultant's Report dated October 8, 2014, stated that Mr. D'Amico should have "surgery for excision" of the lesion.  There was delay in further treatment, but there has been no showing that delay was due to any act or omission by Dr. Montoya.  The motion for summary judgment filed by Dr. Montoya, ECF No. 127, should be granted.

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion for summary judgment filed by Dr. Montoya, ECF No. 127, be **GRANTED**.  It is further recommend that this case be **REMANDED** for further proceedings prior to setting the case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on July 25, 2017.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u> If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**