**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**STEVEN F. D'AMICO,**

      **Plaintiff,**

**vs.**                                **Case No. 4:15cv127-MW/CAS**

**DR. VERNON MONTOYA,
DR. A. BUCARELLI,
DR. ALFONSO MARTINEZ,
DR. P. MARCEUS,
DR. HEZEKIAH OWOJUYIGBE,
and JULIE JONES,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Defendant Dr. Marceus filed a motion to dismiss or for summary judgment.  ECF No. 136.  Dr. Marceus is a Defendant in this case in his individual capacity only.  *See* ECF Nos. 59, 140.  Because the motion referenced exhibits outside of the pleadings, it was construed as a motion for summary judgment.  ECF No. 137.  Plaintiff was given a deadline to respond to the motion after conclusion of the discovery period, and advised of his obligation to respond under Rule 56 and Local Rule 56.1.  ECF Nos. 137, 140.  Plaintiff has not filed a response.  Additionally, this Report and

Recommendation addresses only the motion for summary judgment filed

by Defendant Marceus.  ECF No. 136.

## I. Allegations of the Complaint

Plaintiff Steven D'Amico's second amended complaint [hereinafter

"complaint"] presents claims under the Eighth Amendment.  ECF No. 13.

Mr. D'Amico contends the named Defendants have been deliberately

indifferent to his medical needs and have denied him "necessary medical

care and medications."  *Id.* at 10.  Mr. D'Amico alleges that in 2007, he was

diagnosed with Chronic Lymphocytic Leukemia (CLL), a "slow growing

blood cancer . . . ."  *Id.* at 5.  Mr. D'Amico asserts that CLL cannot be

cured, "but can be managed with proper treatment for 25 years."  *Id.*

Mr. D'Amico began a rigorous course of treatment in 2007 which included

monoclonal anti-body therapy and the medication Rituxan.  *Id.*

Mr. D'Amico said that those quarterly treatments managed his cancer for

seven years.  *Id.*  In 2008, Mr. D'Amico also had "numerous skin lesions"

removed and was prescribed sunblock, hat, long sleeve shirts, and

diphorhydramine because, as a cancer patient, he "is at greater risk for

developing secondary cancers."  *Id.*

In 2012, the Department of Corrections contracted with Corizon to provide health care to inmates in its custody. *Id.* at 6. Following that change, Mr. D'Amico was no longer provided "skin protection passes" and was no longer seen by a dermatologist. *Id.* Mr. D'Amico alleges that Corizon did not make a dermatologist available to "inmates in need of skin care." *Id.* at 8. In 2014, while housed at Taylor Correctional Institution, Mr. D'Amico again sought skin protection, but the request was denied by Defendant Bucarelli who Mr. D'Amico alleges was "dismissive." ECF No. 13 at 6. After being denied skin protection, Mr. D'Amico states he was "exposed to long periods of sun [daily] at Taylor C.I. . . . and developed countless more moles and blemishes which have never been examined by a Dermatologist or any medical staff." *Id.* at 7. He continued to file grievances concerning this issue, but without success. *Id.* at 7-8.

In October 2014, Mr. D'Amico's Rituxan maintenance treatments were "suddenly discontinued" by Defendant Montoya.[1] *Id.* at 8. Mr. D'Amico said he was told that pursuant to "policy," he was supposed to receive Rituxan for only two years. *Id.* Mr. D'Amico alleges he has not seen an oncologist since that time and has "not received medical care of

---

[1] Dr. Vernon Montoya was an Oncologist employed at the Reception and Medical Center in Lake Butler, Florida. ECF No. 13 at 2.

any kind for CLL since October 8, 2014." *Id.* Mr. D'Amico complains that the "lymph nodes in his neck have become enlarged and sore since the Rituxan treatments were stopped." *Id.* He alleges that failing to treat CLL allows it "to progress at great risk to Plaintiff." *Id.*

Mr. D'Amico also contends that Defendant Montoya suspected he had a cancerous skin lesion on his face in October 2014, but "was prevented" from providing treatment, at least in part, because Corizon did not make a dermatologist available. ECF No. 13 at 8. Mr. D'Amico says he lives under emotional duress because the lesion has continued to develop and, also, "because of another lesion on the inside of his mouth which has gone untreated." *Id.* at 9. Mr. D'Amico reported the lesion to Defendant Montoya at his last cancer clinic appointment on October 8, 2014, at R.M.C., but Mr. D'Amico contends the "lesion has been allowed to grow to the point where it now gets bitten when Plaintiff eats food." *Id.*

Mr. D'Amico was transferred to Columbia C.I. Annex where he again began submitting sick call requests and filing grievances. ECF No. 13 at 9. He alleges that he still "has not received any meaningful medical care at Columbia." *Id.* He says that he was "seen briefly by Dr. Marceus in February of 2015 for his CLL as a result of his filings." *Id.* However, he

only told Mr. D'Amico that "his blood work looked good, and gave [him] no

other information regarding the CLL or other cancers." *Id.* The complaint

alleges that Dr. Marceus "displayed willful disregard for the serious risks to

[Mr. D'Amico] caused by not providing the necessary medical care for CLL

and other cancers." *Id.* Dr. Marceus also "continued to deny" him "passes

for sunblock, hat, long sleeve shirts, and skin examinations . . . ." *Id.*[2]

## II. Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Celotex Corp. v. Catrett,

477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The

"party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those

---

[2] Procedurally, Dr. Owojuyigbe ["Dr. Owo"] was substituted as a Defendant pursuant to Rule 25(d) for Dr. Marceus, the chief health officer at Columbia Correctional Institution. *See* ECF Nos. 59, 98. Claims proceed against Dr. Marceus in his individual capacity only and against Dr. Owo in his official capacity only.

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted). "The mere

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

existence of some factual dispute will not defeat summary judgment unless

that factual dispute is material to an issue affecting the outcome of the

case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th

Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir.

2000)).

   "[A]t the summary judgment stage the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202

(1986). "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party."

Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of

evidence" is not enough to refer the matter to a jury). The Court must

decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L.

Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light

most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct.

at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."), but "only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

## III. The relevant Rule 56(e) evidence

Mr. D'Amico entered the custody of the Department of Corrections in 2006. ECF No. 117-1 at 5, 9 (ECF No. 117, Ex. A ["TR"]).[4] Dr. Vernon Montoya, an oncologist, ECF No. 127 at 2, diagnosed Mr. D'Amico with CLL (Chronic Lymphatic Leukemia), and put Mr. D'Amico on an "intensive regimen, which included Rituxan and several other chemos" which lasted for approximately six months. TR at 17-18. Mr. D'Amico began receiving "Rituxan about every three months since 2007." CF No. 113-1 at 3.[5]

---

[4] Plaintiff's deposition transcript was submitted with Dr. Owojuyigbe's motion for summary judgment, ECF No. 117, and has also been considered in ruling on the instant motion. The transcript will be referenced as "TR." Although not cited by Dr. Marceus, the Court "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

[5] Dr. Marceus relies upon the affidavit submitted by Dr. Bucarelli "in which she chronicles the care provided to [Mr.] D'Amico." ECF No. 136 at 3. That affidavit is filed

During the seven years Mr. D'Amico was taking Rituxan, he believed

that his symptoms were controlled because of the therapy regimen.  TR at

18.  However, Dr. Montoya discontinued Mr. D'Amico's treatment with

Rituxan on October 8, 2014.  *Id.* at 18, 20-22.  Dr. Montoya said that he

"was only supposed to be on Rituxan for two years" but had been on it for

seven years.  *Id.* at 22.  The medical records indicate Dr. Montoya stopped

the Rituxan because "the newest medical evidence showed that a patient

needs to be on it for a maximum of two years."  ECF No. 113-1 at 3.

Mr. D'Amico has acknowledged that Dr. Sweetser, another oncologist, also

told him that he should not have been on Rituxan for seven years.  TR at

100, 102-103.

Dr. Bucarelli explains in her affidavit that when Mr. D'Amico was seen

by Dr. Montoya for a follow up visit on October 8, 2014, Dr. Montoya noted

that Mr. D'Amico "had a skin lesion on his nose consistent with basal cell

carcinoma (BCC)."  ECF No. 113-1 at 3.  The plan was for Dr. Montoya to

follow up with Mr. D'Amico in one month after the completion of "lab work"

and a "CT scan of the chest, abdomen, and pelvis."  *Id.*  As reflected in the

Consultant's Report for October 8, 2014, Dr. Montoya planned to refer

———————————

as ECF No. 113-1.

Mr. D'Amico "to surgery for excision" of the skin lesion on his nose. *Id.;* MR at 1.[6]

Mr. D'Amico was transferred from Taylor C.I. to Cross City C.I. on October 24, 2014. Ex. B at 4. Mr. D'Amico's lab work was completed on October 31, 2014. *Id.*

Mr. D'Amico testified that when Dr. Montoya saw the lesion on the right side of his nose and face, he "blurted out 'you have a cancer.'" TR at 34-35. Dr. Montoya "started to writ a consult" for a dermatologist, but the "nurse said there isn't a dermatologist." *Id.* at 35-36. Dr. Montoya then referred him to a surgeon instead. *Id.* at 36.

On November 6, 2014, Dr. Llorens submitted a consultation request for the CT scan, which "was approved and an appointment was made for November 14, 2014." ECF No. 113-1 at 5; *see also* MR at 6. Mr. D'Amico, however, "refused to go" to the CT scan. ECF No. 113-1 at 5 (citing MR at 7). In his deposition, Mr. D'Amico explained that he refused to have the scan because he "already had cancer" and did not "need any extra radiation." TR at 54. Instead, Mr. D'Amico asked for an MRI, as he had

---

[6] Mr. D'Amico's medical records were submitted as Exhibit A to Dr. Bucarelli's affidavit, ECF No. 113-2. They are referenced as MR and the page number of the exhibit as shown on the bottom, right side of the page. For example, MR-1 is Exhibit A, page 1, located at ECF No. 113-1 at 14.

done on several occasions. *Id.* at 54-55. Mr. D'Amico said that in the

beginning, he "was getting CAT scans the whole time, and the frequency

concerned" him. *Id.* at 55. So he would request that Dr. Montoya give him

an MRI instead of CAT scans, "but that never happened." *Id.* at 55. Thus,

Mr. D'Amico explained that his "refusal was not a new" development as he

had done so "for years without Defendant Montoya stopping all

onocological [sic] care" for him. ECF No. 143[7] at 2.

Mr. D'Amico also acknowledged that he refused to meet with

Dr. Hagan, the surgeon referred by Dr. Montoya. TR at 36-38.

Mr. D'Amico said he refused to see him because he was "the same

surgeon that left surgical clips in [his] neck when he did the lymph node

biopsy . . . back in 2007 . . . ." *Id.* at 36; *see also* p. 38. Mr. D'Amico also

explained that in addition to not wanting to see Dr. Hagan, he thought he

"should see a dermatologist who would do a biopsy" which was "more in

line" with Dr. Montoya's original plan. *Id.* at 38.

Mr. D'Amico saw Dr. Hemphill on January 9, 2015. ECF No. 113-1 at

5. Dr. Hemphill noted that Mr. D'Amico "had refused to see a general

---

[7] Mr. D'Amico's response, ECF No. 143, in opposition to Dr. Montoya's summary judgment motion is the equivalent of a declaration as it is sworn under penalty of perjury. ECF No. 143 at 6.

surgeon for the lesion on his nose and refused the CAT scans because he was worried about the radiation."  ECF No. 113-1 at 5.

On January 29, 2015, Mr. D'Amico had lab work completed and then saw Dr. Pierre Marceus in the chronic care clinic on February 2, 2015. ECF No. 113-1 at 6.  This was the only time Dr. Marceus saw Mr. D'Amico. He reviewed the recent lab results "and determined his CLL was stable." *Id.* Dr. Marceus "ordered additional labs and a follow up in the chronic care clinic in six months."  *Id.*; *see also* MR at 20.

Mr. D'Amico previously disputed that his CLL was "stable" based on the January 2015 lab report which revealed several abnormal findings in hematology.  ECF No. 144 at 2 (citing to MR at 19); *see* also July 2015 lab report, Ex. A at 26.  In response to Dr. Montoya's motion, Mr. D'Amico said that Dr. Marceus never told him he was "stable," but instead, said "something to the effect, 'your blood work looks good.'"  ECF No. 143 at 2. Mr. D'Amico said that he pressed him for more information, and "he merely mentioned blood fat, sugar, electrolytes being at good levels."  *Id.*  He said that Dr. Marceus "never mentioned the white blood cell counts emblematic of luekemia [sic]."  *Id.*  Mr. D'Amico contends that hematology test results submitted in this record reveals his "blood cell counts vary from below

normal to barely normal" and he contends his "leukemia was not 'stable,'
and certainly not in remission as suggested by" Department of Corrections
officials.  ECF No. 143 at 3 (citing to ECF No. 113-1, Ex. E).  Mr. D'Amico
did not, however, submit any opposition to Dr. Marceus' motion for
summary judgment.

It is unclear why Dr. Marceus never saw Mr. D'Amico again following
the February 2, 2015, visit.  ECF No. 136 at 4.  Nevertheless, Mr. D'Amico
did have numerous other follow up visits with other medical staff including
Advanced Registered Nurse Practitioner Pastora, *see* ECF No. 113-1 at 6-
7, a nurse, and Dr. Pinero.  ECF No. 113-1 at 8.  In August 2015, ARNP
Pastora noted that Mr. D'Amico's "CLL control was good/fair."  *Id.* at 7.

Eventually, a biopsy was taken from the right side of Mr. D'Amico's
nose on December 18, 2015.  ECF No. 113-1 at 8.  "The diagnosis was
atypical basaloid neoplasm consistent with BCC [basal cell carcinoma]."
*Id.*  On March 28, 2016, Dr. Ong excised the "BCC of the right nasal groove
and multiple hyperpigmented lesions of the head, right ear, right shoulder,
back, chest, and forearm."  *Id.* at 11.

Mr. D'Amico saw additional medical personnel in 2016, including
another oncologist, Dr. Matthew Sweetser.  ECF No. 113-1 at 9-12.

Mr. D'Amico continued to have lab work completed on a regular basis.

ECF No. 113-1 at 8-9, 11. ARNP Pastora issued him "passes for

sunscreen, a straw hat, and a long sleeve shirt." *Id.* at 10. Mr. D'Amico

had multiple excisions perform on March 28, 2016, and was informed that

another lesion removed from his shoulder was also basal cell cancer. ECF

No. 144 at 7.

## IV. Analysis

Deliberate indifference to the serious medical needs of sentenced

prisoners violates the Eighth Amendment's prohibition of cruel and unusual

punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d

251 (1976). A "'serious' medical need is one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention." Hill v.

Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct.

2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp.

269, 311 (D. N.H. 1977)). Alternatively, "a serious medical need is

determined by whether a delay in treating the need worsens the condition"

or "if left unattended, poses a substantial risk of serious harm." Mann v.

Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40

F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.

2003)).

Here, Dr. Marceus neither denies nor confirms that Mr. D'Amico had

serious medical needs.  ECF No. 136.  Notwithstanding, there is no dispute

that Mr. D'Amico has CLL and basal cell carcinoma, which are serious

medical needs.  The dispute, thus, turns on whether Dr. Marceus was

deliberately indifferent to those needs.

The concept of deliberate indifference entails something more than

negligence, but is satisfied by something less than actions undertaken with

an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).

Deliberate indifference has been described as a culpable state of mind of

the defendant to unnecessarily and wantonly inflict pain or harm to a

prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501

U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Ultimately, there are four requirements necessary to sustain an

Eighth Amendment claim concerning a prisoner's need for medical care:

"an objectively serious need, an objectively insufficient response to that

need, subjective awareness of facts signaling the need, and an actual

inference of required action from those facts." <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001); <u>Farrow</u>, 320 F.3d at 1243. After showing a serious medical need, a "prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999)); *see also* <u>Melton v. Abston</u>, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

Medical malpractice does not constitute deliberate indifference. <u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. at 292. "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (citing <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989)). For example, in <u>Estelle</u>, the prisoner received treatment for his back injury (bed

rest, muscle relaxants and pain relievers), but complained that more should

have been done in the way of diagnosis, such as an X-ray or other tests.

The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

When an inmate has received some medical attention or care and the

dispute involves the adequacy of the care, federal courts are reluctant to

second guess medical judgments and find an eighth amendment violation.

Harris, 941 F.2d at 1507.  As stated in McElligott, "[h]esitation does not

mean, however, that the course of a physician's treatment of a prison

inmate's medical or psychiatric problems can never manifest the

physician's deliberate indifference to the inmate's medical needs." 183 F.3d

at 1259 (citing Waldrop, 871 F.2d at 1035).  Thus, liability cannot be

avoided simply by pointing out that *some* medical care was provided,

however cursory or insufficient that care.  *See* Ancata v. Prison Health

Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985); *see also* Hill, 40 F.3d at

1188–89 (stating that "delay in medical treatment must be interpreted in the

context of the seriousness of the medical need, deciding whether the delay

worsened the medical condition, and considering the reason for delay."); 

Taylor, 221 F.3d at 1259–60.

Here, Dr. Marceus evaluated Mr. D'Amico only once.  He reviewed

the recent lab work with Mr. D'Amico and concluded that his condition was

stable.  Mr. D'Amico has not come forward with any evidence that disputes

that fact, nor has he presented evidence which reveals that Dr. Marceus

was deliberately indifferent to his condition.  There is no evidence that

Mr. D'Amico was in pain or discomfort and not provided medication.  There

is no evidence that Mr. D'Amico was either complaining about the lesion on

his nose and was ignored, or otherwise complaining of health issues

related to his CLL which were ignored.  This visit appears to have been a

routine follow-up visit in which Mr. D'Amico's health needs were monitored.

That occurred, even though Mr. D'Amico alleged that more should have

been done for him.  Despite that allegation in the complaint, no evidence

was presented to support this claim at the summary judgment stage of

litigation.  Summary judgment should be granted in favor of Dr. Marceus.

In light of the foregoing, it is respectfully **RECOMMENDED** that the

motion for summary judgment filed by Dr. Marceus, ECF No. 136, be

**GRANTED**.  It is further recommend that this case be **REMANDED** for

further proceedings prior to setting the case for trial.

IN CHAMBERS at Tallahassee, Florida, on July 31, 2017.


S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.