**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**STEVEN F. D'AMICO,**

      **Plaintiff,**

**vs.**                         **Case No. 4:15cv127-MW/CAS**

**DR. VERNON MONTOYA,
DR. A. BUCARELLI,
DR. ALFONSO MARTINEZ,
DR. P. MARCEUS,
DR. HEZEKIAH OWOJUYIGBE,
and JULIE JONES,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Defendant Dr. Ana Bucarelli filed a motion for summary judgment, ECF No. 149, supported by several exhibits, ECF No. 148, including an affidavit filed by Dr. Bucarelli, ECF No. 148-1.  Plaintiff Steven D'Amico, who was proceeding pro se at the time the motion was filed, was given a deadline to respond to the motion and advised of his obligation to respond under Rule 56 and Local Rule 56.1.  ECF No. 155 (citing to ECF Nos. 119, 137, and 140).  Mr. D'Amico filed a response in opposition to her motion, ECF No. 156, and Dr. Bucarelli filed a reply, ECF No. 158.  The motion is

ready for a ruling.  This Report and Recommendation addresses only the

motion for summary judgment filed by Dr. Bucarelli, ECF No. 149.

## I.  Allegations of the Complaint

Plaintiff Steven D'Amico's second amended complaint [hereinafter

"complaint"] presents claims under the Eighth Amendment for deliberate

indifference to his medical needs.  ECF No. 13.  As it relates to the claim

against Dr. Ana Bucarelli, Mr. D'Amico alleged that in 2007, he was

diagnosed him with Chronic Lymphocytic Leukemia (CLL), a "slow growing

blood cancer" by Dr. Montoya.  *Id.* at 5.  CLL cannot be cured, "but can be

managed with proper treatment for 25 years."  *Id.*  Mr. D'Amico began a

rigorous course of treatment in 2007 which included monoclonal anti-body

therapy and the medication Rituxan.  *Id.*

In 2008, Dr. Montoya observed skin lesions on Mr. D'Amico and

referred him to Dr. Salerno, a dermatologist.  ECF No. 13 at 5.  Dr. Salerno

"removed numerous skin lesions" and "prescribed sun block, hat, long

sleeve shirts, and diphorhydramine for several years."  *Id.*  Mr. D'Amico

alleges that he "is at greater risk for developing secondary cancers"

because he has CLL.  *Id.*

In 2012, the Department of Corrections contracted with Corizon to provide health care to inmates in its custody. *Id.* at 6. Following that change, Mr. D'Amico was no longer provided "skin protection passes" and was no longer seen by a dermatologist. *Id.* Mr. D'Amico alleges that Corizon did not make a dermatologist available to "inmates in need of skin care." *Id.* at 8.

In 2014, while housed at Taylor Correctional Institution, Mr. D'Amico again sought skin protection and the renewal of his passes for sun block, hat, and long sleeve shirts which had expired. ECF No. 13 at 6. He was seen by Dr. Bucarelli on April 9, 2014, and Mr. D'Amico alleged that he told her "Dr. Salerno had previously determined that [he] needed skin protection from the sun." *Id.* Mr. D'Amico alleged that Dr. Bucarelli "was dismissive." *Id.* He said that Dr. Bucarelli asked him "if he was a doctor, and refused to address any of [his] concerns." *Id.*

Mr. D'Amico alleged that he was seen by Dr. Bucarelli again on April 23, 2014. ECF No. 13 at 7. He said that he again "sought skin protection" and attempted to explain that Dr. Salerno previously determined that he should be prescribed such protection. *Id.* Mr. D'Amico alleged that Dr. Bucarelli took only "a cursory look at the various moles and blemishes"

on his skin and "announced that [he] was fair skinned, had freckles, and refused to consider [his] need for skin protection." *Id.* Mr. D'Amico filed a grievance on April 25, 2014, about that issue, but Dr. Bucarelli denied his grievance on May 5, 2014, indicating he "did not meet criteria for some of these issues.'" *Id.*

Mr. D'Amico claimed that "Dr. Bucarelli's denial of all skin protection passes demonstrates her depraved indifference to the risks of skin cancer to" him. ECF No. 13 at 7. He claimed that he was "exposed to long periods of sun [daily] at Taylor C.I. . . . and developed countless more moles and blemishes which have never been examined by a Dermatologist or any medical staff." *Id.* at 7.[1]

## II. Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus, summary judgment is proper "after adequate time for discovery and upon

---

[1] Previously, Dr. Bucarelli has been deemed "a proper defendant in her individual capacity for [Mr.] D'Amico's § 1983 claim for damages, but she is not a proper defendant for his claim for injunctive relief." ECF No. 52 at 3. "Dr. Bucarelli is no longer employed by Corizon and no longer provides any care to" Mr. D'Amico. ECF No. 41 at 4-5. Thus, Dr. Bucarelli is sued in her individual capacity only.

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[2] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of

evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L.

Ed. 2d 202 (1986)).  All "justifiable inferences" must be resolved in the light

most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct.

at 2578 (noting the distinction "between evidence of disputed facts and

disputed matters of professional judgment."), but "only if there is a 'genuine'

dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct.

1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557,

586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec.

Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

## III.  The relevant Rule 56(e) evidence

Mr. D'Amico has been in the custody of the Department of

Corrections since 2006.  ECF No. 117-1 at 5, 9 (ECF No. 117, Ex. A

["TR"].[3]  Dr. Ana Bucarelli is a medical doctor who worked at Taylor

Correctional Institution from 2011 through July 4, 2014.  ECF No. 148-1 at

2.  In 2007, Dr. Vernon Montoya, an oncologist, diagnosed Mr. D'Amico

with chronic lymphatic leukemia.  TR at 17; *see also* ECF No. 148-1 at

(Bucarelli's third affidavit).  In March 2014, Dr. Montoya recommended

removal of Mr. D'Amico's port catheter.  ECF No. 148-1 at 3.  The catheter

had been used so that Mr. D'Amico could intravenously receive

medications such as Rituxan.  *Id.*

Dr. Bucarelli first saw Mr. D'Amico on March 28, 2014, in the chronic

care clinic "to follow up regarding his chronic lymphocytic leukemia ('CLL')

for which he had been receiving treatment from other providers for years."

ECF No. 148-1 at 3.  Based on Dr. Montoya's recommendation to remove

the port catheter, she submitted a request for removal, explaining that

removal required "utilization management approval."  *Id.*  Dr. Bucarelli

submitted an "urgent" request for removal of the catheter that same day.

ECF No. 148-2 at 3.  She states that Mr. D'Amico "never mentioned his

skin issues during [that] visit."  ECF No. 148-1 at 3.

---

[3] Plaintiff's deposition transcript was submitted with Dr. Owojuyigbe's motion for summary judgment, ECF No. 117.  Although not cited to by Dr. Bucarelli, it has been considered in ruling on Dr. Bucarelli's motion for summary judgment as is permissible under Fed. R. Civ. P. 56(c)(3).  The transcript will be referenced as "TR."

The first time Dr. Bucarelli saw him for "his skin protection issues was April 9, 2014." ECF No. 148-1 at 4. Dr. Bucarelli is not a dermatologist, but she did take "dermatology classes in medical school" and has "experience recognizing and diagnosing skin lesions." ECF No. 148-1 at 1-2. Dr. Bucarelli states in her affidavit that Mr. D'Amico told her that "he did not have a history of skin cancer, but that a dermatologist previously prescribed him sunscreen, a hat, and long sleeve shirts." *Id.* at 4. She "reviewed the available medical records to confirm [his] statements, but found no confirming information." *Id.* Dr. Bucarelli states that the "records that were available showed no diagnosis of skin cancer and no current or previous passes for sunscreen, hats, or long sleeve shirts." *Id.*

On April 9, 2014, Dr. Bucarelli gave Mr. D'Amico a physical exam and "noted redness around his catheter area." ECF No. 148-1 at 4. As of that date, approval for catheter removal was still pending. *Id.* She also noted Mr. D'Amico was "fair skinned and had freckles on his face, neck torso, and back." *Id.* She also identified "seven raised papular lesions of different sizes." *Id.* A "papular lesion is a general term for a small raised area of abnormal but usually benign skin tissue." *Id.* "A mole is an example of a papular lesion." *Id.* Dr. Bucarelli explained in her affidavit that a "papular

lesion would be cause of concern if it had uneven or ragged edges or borders, different or uneven colors, dimples or ulcerations, or an irregular shape." *Id.* Mr. D'Amico's lesions "were rounded with regular borders, uniform color, and were circumscribed to a single area." *Id.* at 4-5. Dr. Bucarelli said that Mr. D'Amico's lesions "were not dimpled or ulcerated" and she saw nothing on his skin that "appeared cancerous or premalignant." *Id.* at 5. Based on her examination, Dr. Bucarelli "did not believe he met the criteria for skin protection passes . . . ." *Id.*

Dr. Bucarelli attached a copy of Health Services Bulletin No. 15.02.16 which provides guidelines for issuing inmate medical passes. ECF No. 148-3. The Bulletin directs "that 'no sun' passes are issued when the patient has premalignant lesions or if medications are prescribed that increase sun sensitivity." ECF No. 148-1 at 5 (citing ECF No. 148-3 at 4). She advises that her examination of Mr. D'Amico did not reveal a basis for issuing the passes. ECF No. 148-1 at 5. She states that having "fair skin, freckles, and moles, by themselves," is not a sufficient basis "to write a pass for sun protection items." *Id.* Dr. Bucarelli reiterated that although Mr. D'Amico told her that "Dr. Solano recommended those things in the

past, . . . [she] did not see any documentation showing why they were previously prescribed." *Id.*

Dr. Bucarelli advises that "[m]edical records are routinely thinned and placed in storage." ECF No. 148-1 at 5. The medical records department maintains older volumes, and sometimes inactive volumes are left at prior institutions and have to be requested to be sent to the inmate's current facility." *Id.* at 5-6. Dr. Bucarelli's progress note dated April 9, 2014, indicated that she "wanted to review the prior records that were not part of the records that were available to" her. *Id.* at 6. "The standard practice is for nurses to review the provider's notes and gather any requested records." *Id.* The records here show that a nurse reviewed Dr. Bucarelli's "progress notes because there is a nurse's stamp at the bottom of the record." *Id.* (citing ECF No. 148-2 at 4-5). However, Dr. Bucarelli "was not provided the prior medical records before" she left Taylor C.I. on July 4, 2014. ECF No. 148-1 at 6.

Dr. Bucarelli saw Mr. D'Amico again on April 23, 2014, in the chronic illness clinic. ECF No. 148-2 at 8; ECF No. 148-1 at 6. In that meeting, she reports that he was raising several issues "and was angry, demanding, raising his voice, and accusing medical staff of 'taking away his meds' and

not doing their jobs." ECF No. 148-1 at 6. Dr. Bucarelli noted that

Mr. D'Amico "was currently receiving Rituxan treatment every three months

for his CLL." *Id.* "He reported catheter pain." *Id.* (citing ECF No. 148-2 at

8). She examined Mr. D'Amico and "assessed his CLL as stable and

documented redness, inflammation, and pain at the catheter site." ECF

No. 148-1 at 6. She "submitted another request to utilization management

to have the port catheter removed STAT." *Id.* (citing ECF No. 148-2 at 8).

She also renewed his medications, ordered ibuprofen for pain, lab work,

and requested a "consultation with Dr. Montoya, the oncologist, to remove

the catheter." *Id.* at 7. Dr. Bucarelli's progress notes indicate that

Mr. D'Amico "initially sought to discuss his sunscreen and other skin

protection items" but it "appears that he raised other issues and we never

ended up discussing his skin issues, although [she] cannot recall the

details." *Id.* (citing ECF No. 148-2 at 7).

Dr. Bucarelli states in her affidavit that she had requested

Mr. D'Amico's medical records, but had not received them before leaving

her employment with the Department. ECF No. 148-1 at 7. In reviewing

the records for purposes of this lawsuit, she notes that on March 27, 2009,

Mr. D'Amico "had seven angiomas and/or nevomelanocytic lesions excised

by dermatologist Dr. Max Solano." *Id.* (citing ECF No. 148-2 at 10-21).

She states that Dr. Solano diagnosed Mr. D'Amico "with atypical nevi

syndrome, but the pathology report indicated none of the excised lesions

was cancerous." ECF No. 148-1 at 8 (citing ECF No. 148-2 at 13, 15-18).

Dr. Solano "recommended sunblock, a straw hat when working outside,

long sleeves, and an annual dermatology follow up." ECF No. 148-1 at 8

(citing ECF No. 148-2 at 22-24). When she examined Mr. D'Amico five

years later, "none of the moles, or nevi, appeared atypical or premalignant."

ECF No. 148-1 at 8. However, Dr. Bucarelli states that if she "had seen the

records showing prior excision of angiomas and nevomelanocytic lesions,

even though not cancerous, [she] likely would have written the sun

protection passes." *Id.* She also would have "written a consultation

request for a dermatology appointment" based on the recommendation by

Dr. Solano.

Dr. Bucarelli declares that she "never disregarded" Mr. D'Amico's

medical needs. ECF No. 148-1 at 8. Her "examination did not show

anything suspicious or cancerous, and [she] did not get a chance to review

the full records." *Id.*

Mr. D'Amico disputes Dr. Bucarelli's testimony. ECF No. 156. He has pointed to a prior grievance to support his assertion that he informed Dr. Bucarelli of Dr. Solano's dermatological assessment and states that she was dismissive of his concerns and asked him whether he was a doctor. ECF No. 156 at 1-2 (citing ECF No. 47 at 8-10, 13-14, 16).

Mr. D'Amico also points to Health Services Bulletin No. 15.02.16 and contends it demonstrates that he met the criteria for a sun protection pass because he had "premalignant lesions."[4] ECF No. 156 at 2 (citing to ECF No. 148-3 at 4). He asserts that a "patient does not need to actually have skin cancer" to qualify for the pass, but pre-cancerous lesions, such as the ones identified by Dr. Solano in 2009, are sufficient. ECF No. 156 at 2.[5]

Finally, Dr. Bucarelli points to additional evidence in the record which reveals that on October 8, 2014, approximately six months after she examined him, Dr. Montoya observed a skin lesion on Mr. D'Amico's nose that was "consistent with basal cell carcinoma ('BCC')." ECF No. 113-1 at

---

[4] The Health Services Bulletin lists these reasons for issuing a "no sun" pass: "If the actinic rays cause premalignant lesions or if psychotropic or other medications are being prescribed that increase sun sensitivity, request long-sleeve shirts and a hat (broad-brimmed or straw). Sunscreen or hat passes should only be issued when working conditions require such for medical reasons." ECF No. 148-3 at 4.

[5] Mr. D'Amico's response, ECF No. 156, is not a sworn statement and assertions made therein are not accepted as evidence.

3.  A biopsy was finally performed on December 18, 2015, and the "diagnosis was atypical basaloid neoplasm consistent with BCC."  *Id.* at 8.  Mr. D'Amico was seen by Dr. Francis Ong, a plastic surgeon, on February 3, 2016.  *Id.* at 9.  "Dr. Ong assessed BCC of the right nose groove, a skin lesion on the lower back, and a mass in the right buccal area (cheek)."  *Id.*  "Dr. Ong submitted a request for approval of excisions."  *Id.*  Following that examination by Dr. Ong, Mr. D'Amico was "issued passes for sunscreen, a straw hat, and a long sleeve shirt" on February 11, 2016, by ARNP Pastora.  *Id.* at 10.  On March 28, 2016, the excisions were performed by Dr. Ong.  *Id.* at 11.

## IV.  Analysis

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct.

2508, 153 L.Ed.2d 666 (2002) (quoting <u>Laaman v. Helgemoe</u>, 437 F. Supp.

269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is

determined by whether a delay in treating the need worsens the condition"

or "if left unattended, poses a substantial risk of serious harm."  <u>Mann v.</u>

<u>Taser Intern., Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (citing <u>Hill</u>, 40

F.3d at 1188-89, and <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir.

2003)).

Here, Dr. Bucarelli argues that when she saw Mr. D'Amico in March

and April of 2014, his "freckles, moles, and other skin lesions were not an

objectively serious medical need."  ECF No. 149 at 12.  She contends they

"were not atypical or premalignant" and no treatment for them was

necessary.  *Id.*  Nevertheless, Dr. Bucarelli's first examination of

Mr. D'Amico was in relation to his treatment of CLL and a recommendation

by his oncologist to remove a port catheter.  Mr. D'Amico's CLL qualifies as

a serious medical need.  That need cannot logically be separated from

Dr. Bucarelli's treatment.

However, Mr. D'Amico's claim against her is limited to the fact that

Dr. Bucarelli did not provide him with sun protection passes.  ECF No. 13

at 7.  He claims that he "was exposed to long periods of sun daily" while

housed at Taylor Correctional Institution because she did not renew his pass.  *Id.*  He contends that he "developed countless more moles and blemishes" and seeks to hold her liable for not providing him another sun protection pass.  *Id.*  His amended complaint made clear that his "skin protection passes were not renewed" in 2012 when Corizon took over the health service contract with the Department of Corrections.  *Id.* at 6.

A doctor's "deliberate indifference to a prisoner's serious medical needs constitutes the type of cruel and unusual punishment proscribed by the Eighth Amendment."  Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).  "To survive summary judgment on a deliberate-indifference claim, a plaintiff is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa Cty., 50 F.3d 1579, 1582 (11th Cir. 1995) (quoted in Truss v. Warden, No. 15-13431, 2017 WL 1229708, at *1 (11th Cir. Apr. 4, 2017).

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).

Deliberate indifference has been described as a culpable state of mind of

the defendant to unnecessarily and wantonly inflict pain or harm to a

prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501

U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).  "Deliberate

indifference is medical care that is 'so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental

fairness."  Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (quoted

in Truss, 2017 WL 1229708, at *1.

Medical malpractice does not constitute deliberate indifference.

Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in

medical opinion between the prison's medical staff and the inmate as to the

latter's diagnosis or course of treatment support a claim of cruel and

unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.

1991) (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).  For

example, in Estelle, the prisoner received treatment for his back injury (bed

rest, muscle relaxants and pain relievers), but complained that more should

have been done in the way of diagnosis, such as an X-ray or other tests.

The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic

> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

In this case, there is no evidence that when Dr. Bucarelli saw

Mr. D'Amico in March and April 2014 he exhibited any symptoms revealing

the need for a sun protection pass.  There is no evidence that Dr. Bucarelli

was aware of Mr. D'Amico's history of skin lesions.  Indeed, the evidence

here is that if she had known of his history, she would likely have issued

Mr. D'Amico the requested pass.  However, the undisputed evidence is that

Mr. D'Amico voiced concerns and expressed a need for a no sun pass.  Dr.

Bucarelli cannot be faulted for wanting to review the medical records before

issuing him the pass.  Patients will certainly voice many concerns and

requests for treatment, but physicians are prudent to make medical

decisions based on medical examinations and not a patient's subjective

opinion.  Dr. Bucarelli examined Mr. D'Amico and did not find a condition

which warranted issuance of a no sun pass.  She requested his full medical

records to determine if a "no sun" pass might be warranted based on Mr.

D'Amico's statement of his past history.  Yet the undisputed evidence here

is that his complete medical record was not included in the records before

Dr. Bucarelli, and she did not receive them prior to leaving her employ with the Department on July 4, 2014. Why there was a lengthy delay in receiving the records is unknown, but there is no indication from this evidence that Dr. Bucarelli was deliberately indifferent to the medical needs of Mr. D'Amico. The motion for summary judgment filed by Dr. Bucarelli, ECF No. 149, should be granted.

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion for summary judgment filed by Dr. Bucarelli, ECF No. 149, be **GRANTED**. It is further recommend that this case be **REMANDED** for further proceedings prior to setting the case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on August 2, 2017.


 S/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u> If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.