# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**STEVEN F. D'AMICO,**

**Plaintiff,**

**vs.**                                    **Case No. 4:15cv127-MW/CAS**

**DR. VERNON MONTOYA,**
**DR. A. BUCARELLI,**
**DR. P. MARCEUS,**
**DR. ALFONSO MARTINEZ,**
**DR. HEZEKIAH OWOJUYIGBE,**
**and JULIE JONES,**

**Defendants.**

_____/

## REPORT AND RECOMMENDATION

Two motions for summary judgment remain pending in this case: the motion filed by Defendant Julie Jones, ECF No. 164, and the motion filed by pro se Plaintiff Steven D'Amico, ECF No. 153. Although Mr. D'Amico is now represented by counsel, all documents filed concerning these two motions were submitted pro se. No supplemental evidence was filed.

After the motion for summary judgment was filed by Julie Jones, Secretary for the Department of Corrections, ECF No. 164, who is sued in her official capacity only, the pro se Plaintiff was advised of his obligation to

file a response in opposition to that motion, ECF No. 166. His response was timely submitted. ECF No. 168. Plaintiff also filed his own motion for summary judgment, ECF No. 153. Defendant Jones filed a timely response to Plaintiff's motion as well. ECF No. 165. The motions are ready for a ruling.

## I. Allegations of the Complaint

Plaintiff Steven D'Amico's second amended complaint [hereinafter "complaint"] presents claims under the Eighth Amendment. ECF No. 13. Mr. D'Amico contends Defendants have been deliberately indifferent to his medical needs and have denied him "necessary medical care and medications." *Id.* at 10. Mr. D'Amico alleges that in 2007, he was diagnosed with Chronic Lymphocytic Leukemia (CLL), a "slow growing blood cancer . . . ." *Id.* at 5. Mr. D'Amico asserts that CLL cannot be cured, "but can be managed with proper treatment for 25 years." *Id.* Mr. D'Amico began a rigorous course of treatment in 2007 which included monoclonal anti-body therapy and the medication Rituxan. *Id.* Mr. D'Amico said that those quarterly treatments managed his cancer for seven years. *Id.* In 2008, Mr. D'Amico also had "numerous skin lesions" removed and was prescribed sunblock, hat, long sleeve shirts, and

diphorhydramine because, as a cancer patient, he "is at greater risk for developing secondary cancers." *Id.*

In 2012, the Department of Corrections contracted with Corizon to provide health care to inmates in its custody. *Id.* at 6. Following that change, Mr. D'Amico was no longer provided "skin protection passes" and was no longer seen by a dermatologist. *Id.* Mr. D'Amico alleges that Corizon did not make a dermatologist available to "inmates in need of skin care." *Id.* at 8. In 2014, while housed at Taylor Correctional Institution, Mr. D'Amico again sought skin protection, but the request was denied by Defendant Bucarelli who Mr. D'Amico said was "dismissive." ECF No. 13 at 6. Since being denied skin protection, Mr. D'Amico states he was "exposed to long periods of sun [daily] at Taylor C.I. . . . and developed countless more moles and blemishes which have never been examined by a Dermatologist or any medical staff." *Id.* at 7.

In October 2014, Mr. D'Amico's Rituxan maintenance treatments were "suddenly discontinued" by Defendant Montoya.[1] *Id.* at 8. Mr. D'Amico said he was told that pursuant to "policy," he was supposed to receive Rituxan for only two years. *Id.* Mr. D'Amico reports that he has not

---

[1] Dr. Vernon Montoya was an Oncologist employed at the Reception and Medical Center in Lake Butler, Florida. ECF No. 13 at 2.

seen an oncologist since that time and has "not received medical care of any kind for CLL since October 8, 2014." *Id.* Mr. D'Amico complains that the "lymph nodes in his neck have become enlarged and sore since the Rituxan treatments were stopped." *Id.* He alleges that failing to treat CLL allows it "to progress at great risk to Plaintiff." *Id.*

Mr. D'Amico also contends that Defendant Montoya suspected he had a cancerous skin lesion on his face in October 2014, but "was prevented" from providing treatment, at least in part, because Corizon did not make a dermatologist available. ECF No. 13 at 8. Mr. D'Amico says he lives under emotional duress because the lesion has continued to develop and, also, "because of another lesion on the inside of his mouth which has gone untreated." *Id.* at 9. Mr. D'Amico reported the lesion to Defendant Montoya at his last cancer clinic appointment on October 8, 2014, at R.M.C., but Mr. D'Amico contends the "lesion has been allowed to grow to the point where it now gets bitten when Plaintiff eats food." *Id.*

Mr. D'Amico alleged that as of July 2015 when the complaint was filed, he was confined at Columbia C.I. Annex. ECF No. 13 at 9. Despite having "submitted sick call requests and [having] filed grievances regarding the discontinuance of Rituxan treatments for CLL, and other cancer

concerns" he still "has not received any meaningful medical care at Columbia." *Id.* Mr. D'Amico says he is still denied "passes for sunblock, hat, long sleeve shirts, and skin examinations . . . ." *Id.*[2]

## II. Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex

---

[2] Procedurally, Dr. Owojuyigbe was substituted as a Defendant pursuant to Rule 25(d) for Dr. Marceus, the chief health officer at Columbia Correctional Institution. *See* ECF Nos. 59, 98. Claims proceed against Dr. Marceus in his individual capacity only and against Dr. Owojuyigbe in his official capacity only.

Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[3] though affidavits or other Rule 56 evidence "that there is a

genuine issue for trial" or "an absence of evidence to support the

nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks,

548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be

'genuine'" and the non-moving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348,

1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere

existence of some factual dispute will not defeat summary judgment unless

that factual dispute is material to an issue affecting the outcome of the

case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Cir. 2003) (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260 (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, <u>Beard</u>, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."), but "only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct.

1769, 167 L.Ed.2d 686 (2007) (quoted in <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

"Cross motions for summary judgment do not change the standard." <u>Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church</u>, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in <u>Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.</u>, 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" <u>Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n</u>, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting <u>Buell Cabinet Co. v. Sudduth</u>, 608 F.2d 431, 433 (10th Cir. 1979)) (quoted in <u>Ernie Haire Ford, Inc.</u>, 541 F. Supp. 2d at 1297-98)).  Because Plaintiff (as the party with the burden of proof) has a heavier burden on summary judgment, the Court will consider Defendant Jones' motion first.  If that Defendant's motion is denied, the Court will consider whether Plaintiff is entitled to judgment as a matter of law.

## III. Relevant Rule 56 Evidence

Mr. D'Amico is currently 57 years of age and entered the custody of the Department of Corrections in 2006. ECF No. 117-1 at 5, 9 (ECF No. 117, Ex. A ["TR"]).[4] Dr. Vernon Montoya diagnosed Mr. D'Amico with CLL (Chronic Lymphatic Leukemia) in 2007. TR at 17; ECF No. 153 at 1. Dr. Montoya put Mr. D'Amico on an "intensive regimen, which included Rituxan and several other chemos" which lasted for approximately six months. TR at 17-18. Afterwards, he was "put on a reduced maintenance schedule of Rituxan every three months" and was seen by Dr. Montoya every three months thereafter for seven years. *Id.* at 18, 26.[5] During those seven years, Mr. D'Amico believed that his symptoms were controlled because of the therapy regimen. *Id.* at 18.

---

[4] The transcript of Plaintiff's deposition was previously submitted as an exhibit to Dr. Owojuyigbe's motion for summary judgment, ECF No. 117, Exhibit A. ECF No. 117-1. It is referenced herein as "TR." Secretary Jones cited to portions of Mr. D'Amico's deposition, ECF No. 164 at 6-7, but submitted only select pages with her summary judgment motion. ECF No. 164, Ex. B. The references used in this Report and Recommendation are to the complete transcript ("TR") as filed by Dr. Owojuyigbe, ECF No. 117-1.

[5] Additional evidence beyond what was relied upon by Secretary Jones has been included to provide a more complete review of Mr. D'Amico's medical needs and treatment. Mr. D'Amico did not provide any evidence in his opposition to the Secretary's motion for summary judgment. ECF No. 168. He did, however, submit evidence with his own summary judgment motion, ECF No. 153. Additionally, his motion is the equivalent of an affidavit as he has sworn "under penalties of perjury the statements made . . . are true." ECF No. 153 at 7.

Mr. D'Amico also reports that during those seven years, Dr. Montoya "referred him to a Dermatologist, Dr. Salerno at the Speciality Clinic at Lake Butler RMC."  ECF No. 153 at 2.  "Dr. Salerno examined [him] and removed several moles/lesions for biopsies."  *Id.*  "He continued to examine [Mr. D'Amico] every six (6) months, and recommended sun protection." Based on his recommendations, Mr. D'Amico "was provided medical passes for sunscreen, straw hat, long sleeve shirt, and prescribed diphenhydramine[6] for several years."  *Id.*  After Mr. D'Amico was transferred to Taylor C.I., his "medical passes, including his sun protection passes" were discontinued and Doctors Bucarelli, Martinez, and Marceus "refused to renew any of [his] medical passes."  *Id.*  Mr. D'Amico states that he "was forced to spend long periods each day in the sun without any protection for several years."  *Id.*  He advises that he "filed many complaints" (grievances) about the need for a sun protection pass.  *Id.*  He states that as a consequence, he "developed numerous moles, skin lesions, and ultimately skin cancer."  *Id.*

Dr. Montoya discontinued Mr. D'Amico's treatment with Rituxan on October 8, 2014, and, indeed, stopped treating Mr. D'Amico on that date as

---

[6] Diphenhydramine is an antihistamine used to relieve symptoms of allergy, hay fever, and the common cold.  www.webmd.com/drugs

well. *Id.* at 18, 20-21. On what turns out to be Mr. D'Amico's final visit with Dr. Montoya, "he discontinued the Rituxan and all contact with him." *Id.* at 21. Dr. Montoya told Mr. D'Amico that he "was only supposed to be on Rituxan for two years" but had been on it for seven years. *Id.* at 22. A notation in the medical records reveals Dr. Montoya said that "the newest medical evidence shows that a patient needs to be on [Rituxan] for a maximum of two years." *Id.* Mr. D'Amico testified in his deposition that Dr. Montoya did not tell him he was discontinuing the Rituxan because of new medical evidence but, rather, because of "policy." *Id.* at at 23-24. Additionally, Mr. D'Amico said that when he met with Dr. Sweetser (another oncologist) at Lake Butler, he also told Mr. D'Amico that he should not have been on Rituxan for seven years. *Id.* at 100, 102-103.

Mr. D'Amico also testified that staff "would make remarks about how expensive" Rituxan was. *Id.* at 63. He said there were "incidents where they were concerned about the availability, that the therapies were becoming scarce, the costs were going up, how expensive they are, and how there's a shortage." *Id.* Mr. D'Amico specifically said that a term used on one occasion was that "there was a shortage of Rituxan." *Id.*

Dr. Bucarelli submitted an affidavit which explained Mr. D'Amico's medical records. ECF No. 117, Ex. B (ECF No. 117-2 at 3). Dr. Bucarelli said that on October 8, 2014, when Mr. D'Amico was seen by Dr. Montoya for a follow up visit, Dr. Montoya noted that Mr. D'Amico "had a skin lesion on his nose consistent with basal cell carcinoma (BCC)." ECF No. 117, Ex. B at 3. The plan was for Dr. Montoya to follow up with Mr. D'Amico in one month after the completion of "lab work" and a "CT scan of the chest, abdomen, and pelvis." *Id.* As reflected in the Consultant's Report for October 8, 2014, Dr. Montoya also planned for Mr. D'Amico to have surgery to excise the lesion on his nose. *Id.;* MR at 1.[7] Mr. D'Amico, however, was transferred from Taylor Correctional Institution to Cross City Correctional Institution on October 24, 2014. ECF No. 117, Ex. B at 4. Mr. D'Amico's lab work was completed on October 31, 2014. *Id.*

Mr. D'Amico testified that he knew "there was a thing there" on his nose, but had not been concerned about it. TR at 35. Mr. D'Amico thought it "was a mole or something." *Id.* However, when Dr. Montoya saw the

---

[7] Mr. D'Amico's medical records were submitted as Exhibit A to Dr. Bucarelli's affidavit, ECF No. 117-2. To avoid confusion, the medical records are referenced as MR and the page number of the exhibit as shown on the bottom, right side of the page. For example, MR-1 is Exhibit A, page 1, located at ECF No. 117-2 at 14. All references to Exhibit B are to Dr. Bucarelli's affidavit, located at ECF No. 117-2. As noted above, the deposition transcript, which was filed as Exhibit A, is referenced as TR.

lesion on the right side of his nose and face, he "blurted out 'you have a cancer.'" *Id.* at 34-35. Dr. Montoya "started to write a consult" for a dermatologist, but the "nurse said there isn't a dermatologist." *Id.* at 35-36. Dr. Montoya then referred him to a surgeon. *Id.* at 36.

Mr. D'Amico refused to meet with Dr. Hagan, the surgeon referred by Dr. Montoya. TR at 36-38. Mr. D'Amico said he refused to see him because he was "the same surgeon that left surgical clips in [his] neck when he did the lymph node biopsy . . . back in 2007 . . . ." *Id.* at 36; *see also* at 38. Mr. D'Amico also testified that beyond not wanting to see Dr. Hagan, he thought he "should see a dermatologist who would do a biopsy" which was "more in line" with Dr. Montoya's original plan. *Id.* at 38.

Mr. D'Amico went to sick call on April 20, 2015, complaining of "swollen lymph nodes in his neck and abdominal pain." Ex. B at 6. The medical record notes Mr. D'Amico's chief complaint was a "hard mass on lower side of abdomen." Ex. E at 10.[8] He was scheduled to see the doctor for further evaluation on April 29, 2015, *see id.* and MR at 22, but the appointment was rescheduled due to an unexplained "security issue." MR at 23; Ex. B at 6; Ex. E at 12. The notation for the "Doctor's Clinic" for April

---

[8] Exhibit E was also submitted with ECF No. 117 and contains Mr. D'Amico's medical records. *See* ECF No. 117-5.

29, 2015, was "enlarged & painful lymph nodes - ABD mass - migraines."

Ex. E at 12.

Mr. D'Amico was seen by ARNP Pastora in the Doctor's Clinic on

May 6, 2015, for "complaints of discomfort on the right side of his neck and

abdominal pain." Ex. B at 6; Ex. E at 14. Pastora noted his history of CLL

which had been treated with Rituxan for seven years and noted

Mr. D'Amico was requesting a refill. MR at 24. Pastora also "noted that Dr.

Montoya had recommended a follow up in November with blood work

results and CT scan results, but [Mr. D'Amico] refused to have the CT scan

done." Ex. B at 6; MR at 24. Pastora's examination of Mr. D'Amico

revealed "enlarged, tender lymph nodes in his neck." *Id.* Mr. D'Amico was

scheduled for an ultrasound of the abdomen and lab work, and she

"planned to submit a consult with Dr. Montoya with the lab work results."

*Id.* (citing MR at 24); *see also* Ex. E at 14.

Following Mr. D'Amico's lab work in July 2015, he was seen by

ARNP Pastora in the chronic care clinic on August 17, 2015. Ex. B at 7.

Pastora noted in the medical records that his "CLL control was good/fair."

*Id.* She also noted that an appointment would be scheduled for a biopsy of

the skin lesion.  MR at 28.  Another notation in the record states that a consult would be written for Dr. Montoya "after blood work done."  *Id.*

The lab work was done on August 20, 2015.  Ex. B at 7.  Mr. D'Amico had an abdominal ultrasound on September 18, 2015, for his complaints of abdominal pain.  *Id.*  The results were normal, *id.*, and reviewed by ARNP Pastora on September 23, 2015.  MR at 32.

There is no indication that Mr. D'Amico was seen by medical until he reported to sick call on November 7, 2015.  MR at 32-33.  Nurse Hartley noted in the chart that Mr. D'Amico was complaining of "stomach pain and nobody told" him the results of the ultrasound.  MR at 33.  The nurse said that Mr. D'Amico was not complaining of pain but seemed angry about his medical care.  *Id.*  It was also noted that Mr. D'Amico was "talking about 'statute of limitations'" but did "not appear to be in any distress at [that] time."  *Id.*  Nurse Hartley determined no treatment was necessary at that time and noted that an order had been entered for a biopsy on his nose.  *Id.*  Additionally, Mr. D'Amico was requesting "a hat, sunscreen, Excedrin for headaches and to see the [Doctor]."  *Id.*  Nurse Hartley said Mr. D'Amico's chart would be referred to the doctor.  *Id.*

On November 9, 2015, an Excedrin order was written and Mr. D'Amico was scheduled for an evaluation by the doctor.  *Id.*; *see also* Ex. B at 8.  On the following day, November 10th, Mr. D'Amico again went to sick call asking why he had not had a follow up appointment with the doctor.  MR at 33.  He was informed that an appointment was scheduled.  *Id.*  The sick call visit ended due to Mr. D'Amico "insulting staff."  Ex. B at 8; *see also* MR at 33.

On November 18, 2015, Mr. D'Amico was seen by Dr. Pinero in the doctor's clinic for his complaints of occasional abdominal pain on the left side.  Ex. B at 8 (citing MR at 34).  Dr. Pinero noted the "abdominal ultrasound was within normal limits."  *Id.*  On November 25, 2015, Mr. D'Amico was again seen by Dr. Pinero, this time for the lesion on his nose.  Ex. E at 27.

Eventually, the biopsy was taken on December 18, 2015.[9]  Ex. B at 8.  "The diagnosis was atypical basaloid neoplasm consistent with BCC [basal cell carcinoma]."  Ex. B at 8 (citing MR at 35).  Dr. Pinero reviewed the biopsy results and evaluated Mr. D'Amico again on December 29, 2015.  Ex. E at 30.

---

[9] The biopsy was taken after case initiation on March 5, 2015.  ECF No. 1.

On January 15, 2016, ARNP Dawson submitted a consultation request for a plastic surgeon to evaluate Mr. D'Amico based on the results of the biopsy.  Ex. B at 9.  The provisional diagnosis stated on the request was "basal cell cancer" on the right side of the nose.  MR at 41.  The request appears to indicate the "small lesion" had increased in size since "last year."  *Id.*  Mr. D'Amico also reported in his deposition that the lesion had grown by "fifty percent."  Ex. A at 69.  He explained: "It wasn't twice the size, but it was half of what it was bigger than it was prior."  *Id.*  The request was approved and an appointment scheduled for February 3, 2016.  Ex. B at 9.

On January 26, 2016, the senior dentist at Columbia Correctional Institution Annex submitted another consultation request for a biopsy due to Mr. D'Amico's "concern about a nodule on the inside of his right cheek that appeared to be fibroma."  Ex. B at 9; *see also* MR at 42.  Mr. D'Amico saw Dr. Ong, a plastic surgeon, on February 3, 2016.  Ex. B at 9.  Dr. Ong noted "BCC of the right nose groove, a skin lesion on the lower back, and a mass in the right buccal area (cheek)."  *Id.*  Dr. Ong submitted an urgent request for approval of excisions.  *Id.*; *see also* MR at 45-46.  The medical record also reveals an "urgent" request for the excision of several areas

was submitted by ARNP Dawson on February 3, 2016. MR at 44. ARNP

Dawson also reviewed his chart on February 9, 2016. Ex. E at 34-36. A

notation in the chart reflects that Mr. D'Amico would need a "CAT scan of

abdomen" for a follow-up appointment with Dr. Montoya. *Id.* at 36.

Mr. D'Amico was examined by Dr. Render, a dentist, on February 10,

2016, "for complaints of a slowly enlarging nodule on the right buccal

mucosa." Ex. B at 9; *see also* MR at 49. Dr. Render performed "an

excisional biopsy" of the area which revealed "oral fibroma." Ex. B at 9-10.

> Oral fibroma is a common benign scar-like reaction to
> persistent long-standing irritation in the mouth. The most
> common location of oral fibromas is on the inside of the cheek
> where the upper and lower teeth meet. Oral fibroma is usually
> due to chronic irritation such as cheek or lip biting or rubbing
> from a rough tooth. Oral fibromas do not develop into oral
> cancer.

Ex. B at 10.

On February 11, 2016, Mr. D'Amico was seen by ARNP Pastora to

evaluate the need for a CT scan and oncology consult. Ex. B at 10. ARNP

Pastora noted that Mr. D'Amico had a history of CLL and BCC, and had

previously refused a CT scan. Mr. D'Amico was still refusing the scan but

wanted to see an oncologist. *Id.* An oncology consult request was

submitted on or about February 11, 2016. MR at 53. Additionally, ARNP

Pastora issued him passes for sunscreen, a straw hat, and a long sleeve shirt on that same day. Ex. B at 10; *see also* MR at 51-52.

On March 2, 2016, Mr. D'Amico was transported to the Reception and Medical Center [RMC] to be evaluated by Dr. Sweetser, another oncologist. TR 32-33; Ex. B at 11. Dr. Sweetser noted Mr. D'Amico's diagnosis from the medical records, directed that he return for follow-up visits every four months, but did not prescribe any medication to treat Mr. D'Amico's CLL. TR at 33-34. Mr. D'Amico asked Dr. Sweetser about the Rituxan, and he said that Mr. D'Amico should not "have received it for seven years" because "that was too many years." TR at 103. He submitted a request for a follow-up in four months, and an appointment was scheduled for July 5, 2016. MR at 54-55; Ex. B at 11.

Mr. D'Amico testified in his deposition that since October 8, 2014, he had not "been prescribed . . . any medicine to assist with [his] swollen lymph nodes." TR at 31. Mr. D'Amico was questioned in his deposition about whether any doctor, oncologist or not, told him that he "needed to be back on Rituxan." TR at 136. Mr. D'Amico testified that no doctor had said that, but asserted that "other doctors really couldn't answer [the question of

whether he needed to be back on Rituxan] because they said they weren't an oncologist." *Id.*

On March 28, 2016, Dr. Ong performed the excision procedure. Ex. B at 11. Mr. D'Amico not only had the excision on his nose, but "multiple other hyperpigmented lesions of the head, right ear, right shoulder, back, chest, and right forearm" were excised as well. *Id.*; *see also* MR at 57. Mr. D'Amico points out that the excision procedure occurred "18 months after" Dr. Montoya diagnosed him with cancer on October 8, 2014. ECF No. 143 at 3.

Mr. D'Amico "also had blood drawn for labs." Ex. B at 11. ARNP Dawson reviewed Mr. D'Amico's lab work on April 4, 2016, and found his white blood cells were elevated. Ex. B at 11. Mr. D'Amico was prescribed Keflex and was to have follow-up labs in a week. *Id.* The follow-up lab work was done on April 11, 2016. *Id.* at 12.

On April 6, 2016, Mr. D'Amico was seen in sick call with complaints of chest pain, dizziness, numbness in his left arm, and a headache. Ex. B at 11. The nurse took his vitals, which were normal, and performed an EKG. Ex. B at 11. The nurse also "requested the ARNP to evaluate

[Mr. D'Amico] that day, but the appointment was rescheduled due to security locking down [the] facility." *Id.*

Mr. D'Amico saw ARNP Dawson on April 13, 2016, for chest pain. Ex. B at 12. ARNP Dawson noted that EKG results were "atypical due to anxiety." *Id.* She also removed the sutures from the excision sites. *Id.*

On May 1, 2016, Mr. D'Amico was seen in sick call for complaints of another lesion on the right side of his nose. Ex. B at 12. "The nurse documented lichenification - thickening of skin accompanied by accentuation of skin markings." *Id.*; *see also* MR at 65.

"Beginning in April 2016, Centurion began incrementally replacing Corizon as the contracted health care provider for many prisons and jails in Florida." Ex. B at 13. "On May 8, 2016, Centurion took over healthcare operations . . . from Corizon." *Id.* "Corizon no longer has any role in the care" or treatment of Mr. D'Amico. *Id.*

Mr. D'Amico testified in his deposition that when Corizon took over providing medical care to inmates within the Department of Corrections, transferring inmates to an outside hospital or medical facility to see a specialists was done "far less frequently." TR at 97. Mr. D'Amico said that Corizon's "way of saving money" for the State of Florida included reducing

"specialty clinics, access to specialty clinics, frequency, and there were

going to delay it as much as possible, and that's what their policy was."  TR

at 98.  Mr. D'Amico explained that "before Corizon took over, there was a

dermatologist and specialty clinic at Lake Butler Reception Medical

Center."  *Id.*  "After Corizon took over, there [were] no more dermatologists

at Lake Butler."  *Id.* at 98-99.  "And even if a specialist wanted to refer you

to a dermatologist, like Dr. Montoya did . . . it was beyond his ability to do

so."  *Id.* at 99.  Mr. D'Amico specifically testified that "there most certainly

was a need" for him to see a dermatologist, but he was not "transferred

outside of the correctional institution to go see [a] dermatologist."  *Id.*

Mr. D'Amico points out that "[f]or eighteen (18) months, no doctor

qualified to treat leukemia examined" him.  ECF No. 153 at 3.  He asserts

that the "delay worsened the condition of his neck lymph nodes and caused

them to grow enlarged."  *Id.*  He states that his lymph nodes currently are

enlarged and have swelling which "extends out almost as far as his ears."

*Id.*  He complains that he "has complained about enlarged lymph nodes in

his neck for two years," but Dr. Montoya told him they were "not significant

enough."  *Id.* at 6.  He points out that Dr. Montoya told him his CT scan was

negative, but the scan was of his abdomen and not his neck.  *Id.*

Mr. D'Amico asserts that the Department of Corrections "adopted Corizon's 'Utilization Management' policy in the region where [he] was imprisoned." *Id.* at 3. "Their policy encouraged medical staff to deny and delay all specialty clinic care to prisoners." *Id.*

Mr. D'Amico also states that "[l]ab tests of his vital blood cell counts were <u>not</u> ordered regularly, and the unstable results were not evaluated and/or acted upon adequately." ECF No. 153 at 3. He does, however, indicate that he "can now expect . . . lab tests every six (6) months." *Id.* at 6. Mr. D'Amico further states that he has "received no treatments for the enlarged lymph nodes in his neck and his unstable vital blood cell counts." *Id.* He states that he needs treatment "by a doctor who recognizes the seriousness of leukemia." *Id.* at 5.[10]

---

[10] Mr. D'Amico's motion for summary judgment, which is also deemed to be an affidavit under Rule 56(c)(4), contains assertions for which he does not cite to medical evidence, nor does he assert a basis for personal knowledge, or provide facts showing he is "competent to testify on the matters stated" as required. Fed. R. Civ. P. 56(c)(4). Such assertions cannot be considered as relevant Rule 56 evidence.

## IV. Analysis

The Eighth Amendment imposes an obligation on state governments "to provide minimally adequate medical care to those whom they are punishing by incarceration." Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991). "The State's obligation remains even if it has contracted with private parties to provide medical care." Braggs v. Dunn, — F.Supp.3d —, No. CV-214-CV-601-MHTWO, 2017 WL 2773833, at *8 (M.D. Ala. June 27, 2017) (citing West v. Atkins, 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). "That is, the State is liable for the contractor's unconstitutional policies and practices if the contractor is allowed to determine policy either 'expressly or by default.'" Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 706 n.11 (11th Cir. 1985) (cited in Braggs, 2017 WL 2773833, at *8). Moreover, it has long been established that "establish[ing] or utiliz[ing] a policy or custom requiring that inmates seek court orders to obtain medical services" is a basis for liability "if the result of that policy or custom played a role in any deliberate indifference to" an inmate's medical needs. Ancata, 769 F.2d at 706 (citing Berdin v. Duggan, 701 F.2d 909 (11th Cir. 1983)).

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition of cruel and unusual punishment.

Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "A

serious medical need is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention.'"  Johnson v. McNeil,

278 F. App'x 866, 870 (11th Cir. 2008) (citing Hill v. Dekalb Reg'l Youth

Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)).  Alternatively, "a serious

medical need is determined by whether a delay in treating the need

worsens the condition" or "if left unattended, poses a substantial risk of

serious harm."  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir.

2009) (citing Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235,

1243 (11th Cir. 2003)).

Here, Secretary Jones neither denies nor confirms that Mr. D'Amico

has serious medical needs.  ECF No. 164.  Nevertheless, it is concluded

that Mr. D'Amico's Chronic Lymphatic Leukemia (CLL), Basal Cell

Carcinoma (BCC), and Lymphoma are serious medical needs.  The dispute

here, thus, turns on whether the Secretary was deliberately indifferent to

those needs.

After showing a serious medical need, a "prisoner must prove three

facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of

that risk; and (3) by conduct that is more than mere negligence."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); *see also* Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994). Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).  However, medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)

(citing <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989)).  In <u>Estelle</u>,

the prisoner received treatment for his back injury (bed rest, muscle

relaxants and pain relievers), but complained that more should have been

done in the way of diagnosis, such as an X-ray or other tests.  The Court

rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

Delay in providing "diagnostic care and medical treatment known to

be necessary" for non-medical reasons may qualify as deliberate

indifference.  <u>Simmons v. Monserrate</u>, 489 F. App'x 404, 406 (11th Cir.

2012) (citing <u>H.C. ex rel. Hewett v. Jarrard</u>, 786 F.2d 1080, 1086 (11th Cir.

1986), and <u>Ancata</u>, 769 F.2d at 704 ("[I]f necessary medical treatment has

been delayed for non-medical reasons, a case of deliberate indifference

has been made out.")).  "[T]he tolerable length of delay in providing medical

attention depends on the nature of the medical need and the reason for the

delay." <u>Harris v. Coweta County</u>, 21 F.3d 388, 393–94 (11th Cir. 1994)

(quoted in <u>Hill</u>, 40 F.3d at 1188).  Furthermore, the delay "must be

'tantamount to unnecessary and wanton infliction of pain,' and we require an inmate who alleges a delay-based Eighth Amendment claim to 'place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'" <u>Simmons</u>, 489 F. App'x at 406 (citing <u>Hill</u>, 40 F.3d at 1187-88).

Mr. D'Amico generally alleged that his Eighth Amendment rights were violated by the delay and denial of necessary medical care and medications. ECF No. 13; ECF No. 153. Specifically, he has challenged: (1) the discontinuation of Rituxan and the lack of medical care for CLL; (2) the withdrawal of passes for sunblock, hat, and long sleeve shirts; and (3) leaving his lesions untreated and unexamined by a dermatologist. ECF No. 13 at 8-10.

In this case, no evidence in the record supports Mr. D'Amico's challenge to the decision to discontinue providing him with Rituxan. While Mr. D'Amico provided some evidence to suggest that the decision might be based on the cost of the drug, it still remains that there is no medical evidence in the record which demonstrates that discontinuing Rituxan would subjectively put Mr. D'Amico at a risk of serious harm. No other doctor has come forward to say he should be on Rituxan or a similar

medication, and there is no medical evidence to show that Mr. D'Amico has been harmed by the discontinuation of that drug.[11]  Rather, the decision to continue or discontinue a prescription constitutes medical judgment, and disagreeing with that judgment is the quintessential difference of medical opinion which is insufficient to state a claim under the Eighth Amendment.

The second challenge raised concerns over the withdrawal, or failure to renew, Mr. D'Amico's passes for sunblock, hat, and long sleeve shirts. He provided evidence showing that Dr. Salerno had given him such passes for several years.  Although the passes were discontinued for a period of time by some medical providers, they were eventually renewed by another. No evidence has been provided which demonstrates that the withdrawal was due to a policy or procedure of Corizon, much less that any such policy may be attributable to Secretary Jones.  There is also no "verifying medical evidence in the record" which shows that Mr. D'Amico suffered any detrimental effects from not having sunblock, a hat, or long sleeves for a few years.  He argues that he developed "numerous moles, skin lesions,

_____

[11] It does not go unnoticed that a prisoner will have a difficult time placing "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment" which is required to succeed on an Eighth Amendment claim.  Hill, 40 F.3d at 1188.  A prisoner does not have the ability to simply go to another doctor for a "second opinion" or differing opinion.  A prisoner is permitted to see a doctor only upon approval from medical staff, and there is no evidence that he has any choice in the matter.

and ultimately skin cancer" as a result. ECF No. 153 at 2. However, no medical evidence supports that assertion. Without such evidence, it cannot be known whether the moles and lesions are a result of sun exposure over Mr. D'Amico's lifetime as opposed to the lack of sunscreen, hat, and long-sleeves for several years while in prison.

More troubling in this case is Mr. D'Amico's third challenge concerning the delay in providing him with treatment for the lesion on his nose which was detected on October 8, 2014, by his oncologist. Medical care for that issue was recommended by Mr. D'Amico's treating physician. The care plan was noted by other medical providers, yet it took until December 18, 2015, to have a biopsy performed which confirmed the lesion was cancerous. It then took an additional three months (until March 28, 2016) to excise the lesion, along with multiple other lesions. The delay is both extraordinary and unexplained. The justifiable inference is that treatment was delayed for non-medical reasons. Another inference that may be made is that Mr. D'Amico did not receive medical care for suspected cancer until after he filed this lawsuit. However, this claim is also insufficient because there is no evidence to establish "whether the delay worsened the medical condition" or had any detrimental effect on

Mr. D'Amico.  Despite the appearance of counsel, no evidence was presented to support Mr. D'Amico's claim.

It is not hard to imagine the mental anguish and emotional pain inflicted on one who has been left to ponder whether he has cancer and, if so, what type of cancer it may be.  Mr. D'Amico was placed in such a position for fourteen months, and then he had to wait three more months to have it removed.  Nevertheless, as a prisoner, he is barred from recovering "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e) (quoted in ECF No. 164 at 18).  Even if summary judgment were recommended in Mr. D'Amico's favor, and it is not, he could not recover for the mental pain he has endured.

## RECOMMENDATION

It is respectfully **RECOMMENDED** that the motion for summary judgment filed by Mr. D'Amico, ECF No. 153, be **DENIED**, and the summary judgment motion filed by Secretary Julie Jones, ECF No. 164, be **GRANTED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 30, 2017.


S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**